# CANADIAN RIVER GAS CO. v. TERRELL et al.

## CITIES SERVICE GAS CO. v. SAME.

## TEXOMA NATURAL GAS CO. v. SAME.

### Nos. 446, 445, 444.

District Court, W. D. Texas, Austin Division.
June 22, 1933.

J. J. Hedrick, of Chicago, Ill., Brady Cole, of Houston, Tex., and D. H. Culton and S. A. L. Morgan, both of Amarillo, Tex. (Baker, Botts, Andrews & Wharton, of Houston, Tex., and Morgan, Culton, Morgan & Britain, of Amarillo, Tex., of counsel), for complainant Texoma Natural Gas Co.

James W. Finley and R. E. Cullison, both of Bartlesville, Okl., David B. Trammell and Lloyd E. Price, both of Fort Worth, Tex. (Frueauff, Robinson & Sloan, of New York City, and Phillips, Trammell, Chizum, Price & Estes, of Fort Worth, Tex., of counsel), for complainant Cities Service Gas Co.

Madden, Adkins, Pipkin & Keffer, of Amarillo, Tex., and Vinson, Elkins, Sweeton & Weems, and Andrews, Streetman, Logue & Mobley, all of Houston, Tex., for complainant Canadian River Gas Co.

James V. Allred, Atty. Gen., Maurice Cheek and Willis E. Gresham, Asst. Attys. Gen., and Robert E. Hardwicke, Sp. Counsel, of Fort Worth, Tex., for defendants.

Before HUTCHESON, Circuit Judge, and WEST and McMILLAN, District Judges.

McMILLAN, District Judge.

These three cases originated with the filing of separate bills in equity by the three complainants for the purpose of enjoining the enforcement of certain sections of chapters 26 and 28 of the Acts of the Forty-Second Legislature of the state of Texas (1931)' 1st Called Sess., relating to oil and gas, and a certain order of the Railroad Commission of Texas passed on December 30, 1932, in alleged pursuance of said statutes.

A temporary restraining order was granted by the District Judge in each case, and, the validity of the statutes and order being assailed under the Constitution, a three-judge court was organized in accordance with the federal statute. The three cases, involving practically the same subject-matter, were heard together before that court, on application for temporary injunction.

It appears from the record and the uncontroverted facts that diversity of citizenship exists between the plaintiff and defendants in each case; that the requisite amount in controversy is involved, and that substantial federal questions are at issue. No question with regard to jurisdiction, either federal or equitable, is presented, and it accordingly appears, and we find, that the court has jurisdiction to entertain and dispose of the three cases.

The cases were fully heard on the sworn pleadings, various ex parte affidavits and oral testimony given in open court at the time of submission, and thereafter very full and able briefs were filed on behalf of all parties.

These cases involve what is commonly known as the Western Panhandle Gas Field, and this is the third time that this court has been called on to pass on statutes and orders relating to the production and marketing of gas from that field. Two of the present plaintiffs—Texoma Natural Gas Company, and the Cities Service Gas Company—were plaintiffs in the prior cases. The Canadian River Gas Company is plaintiff for the first time in the present case.

The first case involved what was commonly known as the Common Purchaser Act (Acts 1931, 1st Called Sess., c. 28 [Vernon's Ann. Civ. St. art. 6049a]), and as a result of that case the enforcement of that act, insofar as it related to gas, was permanently enjoined on various constitutional grounds. See Texoma Natural Gas Co. v. Railroad Commission of Texas et al. (D. C.) 59' F.(2d) 750.

The second case is commonly referred to as the "Shut Down Case," and involved an order of the Railroad Commission shutting down all the gas wells in a certain delimited area until such time as the owners of other wells in that area obtained a market, and limited other wells in the adjoining area to a flow of not more than 4 per cent. of their potential capacity. This order was restrained on various constitutional grounds. See Texoma Natural Gas Co. v. Terrell et al. (D. C.) 2 F. Supp. 168.

Neither of these cases was appealed.

While the second case was under consideration in this court, the Legislature passed the statutes which are now assailed, and shortly after the passage of these statutes the Railroad Commission promulgated the order in question here. The particular section the commission purports to have proceeded on in the passing of this order is section 4 of Acts 1932, 4th Called Sess., c. 2 (article 6049d, § 4, Vernon's Ann. Civ. St.). That section, together with section 14 of the same article, is as follows:

"Sec. 4. Whenever the full production, from wells producing gas only, from any common source of supply of natural gas in this State is in excess of the reasonable market demand, the Railroad Commission shall inquire into the production and reasonable market demand therefor and shall determine the allowable production from such common source of supply, which shall be the reasonable market demand which can be produced without waste, and the Commission shall allocate, distribute or apportion the allowable production from such common source of supply among the various producers on a reasonable basis, and shall limit the production of each producer to the amount allocated or apportioned to such producer.

"Sec. 14. The provisions of this Act shall end and terminate September 1st, 1935."

The Legislature, at the same time, either enacted or re-enacted various statutes relating to the conservation of oil and gas, prohibiting and defining waste, which statutes (Vernon's Ann. Civ. St. arts. 6014, 6029), so far as they are pertinent, are set out in the footnote below.[1]

---

[1] "Art. 6014. 'Waste'

"The production, storage or transportation of crude petroleum oil or of natural gas in such manner, in such amount, or under such conditions as to constitute waste is hereby declared to be unlawful and is prohibited. The term 'waste' among other things shall specifically include:

"(a) The operation of any oil well or wells with an inefficient gas-oil ratio, and the Commission is hereby given authority to fix and determine by order such ratio.

"(b) The drowning with water of any stratum or

Article 6049c, as amended (Vernon's Ann. Civ. St. art. 6049c) substantially delegated to the commission the power to hold hearings

part thereof capable of producing oil or gas, or both oil and gas, in paying quantities.

"(c) Underground waste or loss however caused and whether or not defined in other subdivisions hereof.

"(d) Permitting any natural gas well to burn wastefully.

"(e) The wasteful utilization of natural gas, provided, however, the utilization of gas, lawfully permitted to be produced from a well producing both oil and gas, for manufacturing gasoline shall not be construed to be wasteful, and provided further that the utilization of natural gas authorized by the Commission under the provisions of Section 2 of Acts of the Forty-Second Legislature, First Called Session, Chapter 26 (Art. 6008), shall not be construed as wasteful.

"(f) The creation of unnecessary fire hazards.

"(g) Physical waste or loss incident to, or resulting from, so drilling, equipping, locating, spacing or operating well or wells as to reduce or tend to reduce the total ultimate recovery of crude petroleum oil or natural gas from any pool.

"(h) Waste or loss incident to, or resulting from, the unnecessary, inefficient, excessive or improper use of the reservoir energy, including the gas energy or water drive, in any well or pool; however, it is not the intent of this Act to require repressuring of an oil pool or that the separately owned properties in any pool be unitized under one management, control or ownership.

"(i) Surface waste or surface loss, including unnecessary or excessive surface losses or destruction of crude petroleum oil or natural gas without beneficial use.

"(j) The escape into the open air, from a well producing both oil and gas, of natural gas in excess of the amount which is necessary in the efficient drilling or operation of the well. * * *

"The Commission is expressly authorized to consider any or all of the above definitions in making rules, regulations or orders to prevent waste of oil or gas. (As amended Acts 1932, 42nd Leg., 4th C. S., p. 3, ch. 2, § 1.)

"Art. 6029. Rules and Regulations

"The Commission shall make and enforce rules, regulations or orders for the conservation of crude petroleum oil and natural gas and to prevent the waste thereof, including rules, regulations or orders for the following purposes:

"(1) To prevent the waste, as hereinbefore defined, of crude petroleum oil and natural gas in drilling and producing operations and in the storage, piping and distribution thereof.

"(2) To require dry or abandoned wells to be plugged in such way as to confine crude petroleum oil, natural gas, and water in the strata in which they are found and to prevent them from escaping into other strata.

"(3) For the drilling of wells and preserving a record thereof.

"(4) To require wells to be drilled and operated in such manner as to prevent injury to adjoining property.

"(5) To prevent crude petroleum oil and natural gas and water from escaping from the strata in which they are found into other strata.

"(6) To establish rules and regulations for shooting wells and for separating crude petroleum oil from natural gas.

"(7) To require records to be kept and reports made by oil and gas drillers, operators, and carriers of crude petroleum oil or natural gas and by its inspectors.

"(8) It shall do all things necessary for the conservation of crude petroleum oil and natural gas and to prevent the waste thereof, and shall make and enforce such rules, regulations or orders as may be necessary to that end. (As amended Acts 1932, 42nd Leg., 4th C. S., p. 3, ch. 2, § 7.)"

for the purpose of inquiring into the production, storage, and transportation of oil and gas, and to pass rules and regulations for the purpose of carrying the various statutes into effect.

Article 6036, as amended by Acts 1931, 1st Called Sess., c. 26, § 3 (Vernon's Ann. Civ. St. art. 6036) denounces certain penalties for the violation of any of the rules, regulations, or orders of the commission made in pursuance of the oil and gas statutes.

Plaintiffs, in their various bills, attack the amended statutes and the order of December 30 on many constitutional grounds; their main contentions being that the statutes and the order are confiscatory, deprive them of their property without due process, constitute an undue burden on interstate commerce, and impair the obligation of certain contracts which they have made for the furnishing of gas to consumers in other states. We do not consider it necessary to detail the pleadings at length, as they track the customary forms of pleadings in cases of this kind. They allege, in each instance, that they are the owners or lessees of large tracts of gas-producing land in the Panhandle Field; that they have numbers of producing wells on these tracts; that they have constructed pipe lines which are connected with many of these wells; that the pipe lines extend into other states; that they are operating their properties in a prudent, careful, and proper manner, without waste of any character; that they have withdrawn, and are withdrawing, only a very small portion of the gas which lies under their own properties; that practically all of the gas which they are producing and marketing is the subject-matter of interstate commerce; that said gas is being delivered in other states to consumers under contracts which were in existence prior to the passage of the act and order complained of.

The answers of the defendants are substantially the same in each case. Complainants' allegations with regard to their properties, gas wells, and pipe lines are admitted, and no question is raised as to the interstate character of complainants' operations or the existence of the contracts alleged. Defendants admit their intention to enforce the statutes and the order of the Railroad Commission, but deny that the statutes and order are void, and, on the contrary, assert that the same are valid police regulations and are enforceable as such. They further plead that the commission, in its order, held the case open on the docket for further orders or change, and that complainants, having failed

to apply for a rehearing, are estopped to resort to a court of equity. In their answers in the Texoma Case and the Cities Service Case they make the following admissions: "Defendants admit that there is no actual physical waste caused by the production by the plaintiff of the gas from its gas wells, except to the extent that the operations of plaintiff and other companies similarly situated may affect the rights and conduct of other operators in the same field."

There is no such admission made in the answer in the Canadian Case, but there is nothing in the record to differentiate that case from the other two cases.

The order of the Railroad Commission of December 30, 1932, ascertains and declares the market demand for gas from this particular field to be 300,000,000 cubic feet of gas daily. It allocates this gas upon a unit basis, providing for units of 160 acres upon which a well has been completed, allocating the allowable production to the producers in said field one-half to each unit or fractional unit in that proportion that the open flow capacity of the well on said unit or fraction bears to the total of the open flow capacity of all units and fractions thereof, and the other half under a certain algebraic formula unnecessary to set out in detail here.

Without going further into the order, it is sufficient to say that it appears from the bills and affidavits that its effect will be to limit the production from complainants' wells to a quantity from 2 to 4 per cent. of the potential capacity of such wells, and that such amount of gas will be entirely insufficient to fill complainants' requirements.

The evidence shows that practically all of the gas from this Panhandle Field is being marketed by the major pipe line companies, and the only available markets for natural gas in the vicinity of the Panhandle Field have been supplied. Accordingly, such market as can be said to exist consists of the market which has been developed and is being supplied by the pipe line companies. Gas, unlike oil, cannot be stored, and must be piped and used as produced. There are approximately 50 gas wells in this area which have no market outlet, and the effect of the commission's order will be to apportion to these wells about 18 per cent. of the daily allowable. Accordingly, the major pipe line companies, which are at this time supplying practically the entire market, will fall, under this allowable, 18 per cent. short of being able to supply the market demand. This necessarily grows out of the fact that 18 per cent. of the allowable is accorded to wells which have no market or facilities for reaching markets.

This condition cannot be rectified by the drilling of additional wells, as the bringing in of each new producer reduces the allowable to those in existence, and under this order there will always be a shortage so long as a certain amount of gas is apportioned to wells which are unable to deliver to the market.

Bearing these facts in mind, it is at once apparent that the ultimate effect of the order, if enforced, will be to compel the producers with markets to buy from those wells which have no markets, if the entire market demand is to be supplied.

Other than these facts which we have set out as appertaining to this last order, the facts in this case, in so far as they relate to the Texoma Natural Gas Company and the Cities Service Gas Company, are practically the same as they were in the two preceding cases which have been mentioned. While there are slight variations with regard to the facts connected with the Canadian River Gas Company's case, the evidence shows that they stand in substantially the same position as the other complainants, and we do not feel it necessary to detail the record with regard to them further in order to dispose of the matters at issue.

While the statute and order have been attacked on a great many different constitutional grounds, which have been very earnestly urged by counsel for the various complainants, we are of the opinion that there are two controlling questions in the case which must be held to be determinative of all of the issues involved here.

Counsel for the defense assert, first, that the statute and order are sustainable upon the theory of correlative rights attaching to owners of gas in a common pool, and that the purpose of the Legislature in passing section 4 was to establish such a doctrine in Texas.

Second, they contend that, if this view be not tenable, the order of the commission passed in pursuance of the amended statutes is sustainable on the theory that it has a valid and a reasonable relation to the prevention of waste.

If it be true, as contended by defendants, that the effect of section 4 is to change the property rule heretofore existing in Texas, and that it undertakes to authorize the commission, without consideration of the question of waste, to determine the potential production of the field, and then allocate that

production among all the wells in it on some basis that it might fix in order to give each well owner a right in the market available to those who have market outlets, then a very serious question as to its constitutionality would be presented, under which it would be necessary to inquire into the various grounds of attack urged by the complainants. However, we are not of the opinion that the statute has any such effect or that the Legislature so intended it to operate.

Under the property rules in force in various states, such as Delaware, Oklahoma, Kentucky, California, and others, a landowner has no absolute title to oil or gas in place, but has only the right to acquire title upon reducing such minerals to possession. This doctrine has been expressly denied in Texas, and it has long been the settled law of the state that the landowner holds title to the oil and gas underlying his land in place, and that he has the right to withdraw same from the ground by mining operations, and that the fact that in so doing he may incidentally appropriate some of the oil or gas underlying his neighbor's ground does not deprive him of that right. Stephens County v. Mid-Kansas O. & G. Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566; Prairie O. & G. Co. v. State (Tex. Com. App.) 231 S. W. 1088; Houston & T. C. R. Co. v. East, 98 Tex. 146, 81 S. W. 279, 66 L. R. A. 738, 107 Am. St. Rep. 620, 4 Ann. Cas. 827; Hunt v. State (Tex. Civ. App.) 48 S.W.(2d) 466. However, it is well established by the decisions of the federal courts in Texas that, notwithstanding this prevailing rule of property, the state has the power to regulate the use of its natural resources so as to prevent their waste. Henderson, Inc., v. Railroad Commission (D. C.) 56 F.(2d) 218; People's Petroleum Producers v. Sterling (D. C.) 60 F.(2d) 1041.

Bearing these premises in mind, we think that in gas cases the confusion which a reading of section 4 causes is at once dissipated by the conclusion that this section must be read in connection with all other sections of the act which relate to waste; that it authorizes action under it only when waste is being or is about to be committed, and that, read in the light of the other statutes which have been footnoted in this opinion, it constitutes an instruction to the commission, where it finds it necessary to prevent waste, to limit the production and to allocate it justly and equitably.

Should we take the other view and construe section 4 as standing alone, then it would constitute, without sufficient checks, balances, or safeguards, a mandate to the commission authorizing it to unreasonably interfere with an owner in the possession and use of his property when no public interest is affected or at stake. If the Legislature had intended to change the rule of property heretofore existing in Texas so as to take from the landowner the absolute title to his gas in place, and give him in lieu thereof some indeterminate interest in a common pool or general reservoir, or the right to produce, under license, from such common pool or general reservoir, then, certainly, it would have expressed that intention in more apt and clear language. It is hardly conceivable that it proposed to change this law and establish a rule of property by a temporary statute which expressly provides that its provisions shall end and terminate within less than three years.

As between a construction which would render the statute invalid or of doubtful validity and one which would sustain its validity, we think it clear that we should adopt the latter construction.

Accordingly, we find and hold that section 4 should be construed in connection with and as a part of the other statutes passed at the same time and relating to waste, and that the order of the commission cannot be sustained upon any theory that the effect of this statute was to delegate to it the authority to apportion this gas and limit and control its production and marketing through any abstract doctrine of correlative rights, without regard to actual waste.

Passing, then, to the second proposition urged by the defendants, the question arises as to whether this order may be sustained as having any reasonable relation to the prevention of the waste of gas in the Panhandle Field. It is unnecessary to discuss the evidence at length with regard to this matter. As we have heretofore noted, the defendants have admitted in their answers that there is no actual physical waste caused by the production by two of the plaintiffs of gas from their wells, except to the extent that the operation of said plaintiffs and other companies similarly situated affect the rights and conduct of other operators in the same field.

Without regard to this admission, the evidence in the case amply establishes the fact that the properties of all the plaintiffs are being operated in a prudent and skillful manner, and that no actual physical waste had been, or was being, or would be committed by them.

It can hardly be successfully contended that the taking by plaintiffs by drainage of gas of other adjacent property owners without market facilities, if such were the case, constitutes waste of a character that could be regulated under the existing statutes. Here, as in the "Shut Down Case," the undisputed evidence indicates that plaintiffs are not and have not been taking the proportion of gas which, under allocation, would be their due. Were they, however, draining their neighbor's gas, which, under the property rule recognized in Texas, they would have the right to do, there would be no waste in connection therewith of which the commission could take cognizance. As there is no evidence to show that, because of plaintiffs' operations any of said gas was being lost or dissipated, the commission would not be authorized to intervene in the matter solely for the purpose of adjusting the respective property rights of the parties.

However, the defendants further contend that the element of waste arises in the case because of the fact that the complainants having markets for their gas will eventually drain the gas of their neighbors without markets, and that these neighbors, to prevent this taking of their gas, will resort to a wasteful use of it; that is to say, the stripping of it for gasoline. If it be recognized that this stripping process is wasteful, it would seem to be a queer anomaly for the commission to say to one owner that he could not produce the gas from under his land because if he did so another owner, in order to protect himself, would have to be allowed to make an improper and wasteful use of the gas from the same field.

Under the conservation statutes, the commission has been empowered to regulate and prevent this stripping of gas, and their action in so doing has been upheld by this court in the Henderson Case. Their present contention seems, to say the least, far-fetched and equivocal, in view of the fact that the record now shows that they were issuing these stripping permits at the very time of the trial of this case. If it was a wasteful and unlawful thing for persons to strip this gas, the commission had no right to prevent a lawful taking by others to prevent this unlawful taking. Furthermore, the Legislature of the state of Texas, during its last Regular Session (chapter 100), amended article 6008 (Vernon's Ann. Civ. St. art. 6008), so as to provide that in all common reservoirs or pools of more than 300,000 acres, where there is no reasonable market for light or fuel available to the owner, gas may be stripped to the extent of 25 per cent. of the open flow of the wells, and that such utilization shall not constitute waste. While this act does not take effect until 90 days after adjournment, still it, taken together with the action of the commission in issuing stripping permits, indicates the policy of the state with regard to the matter. It is difficult to perceive how it can be logically contended that stripping constitutes waste, in view of these permits and this legislative enactment.

Defendants further contend that this case is ruled by the decision of the Supreme Court of the United States in the Champlin Case, 286 U. S. 210, 52 S. Ct. 559, 76 L. Ed. 1062. The Champlin Case arose, of course, under the laws of Oklahoma, where the rules of property with regard to oil and gas differ from the laws of Texas. That point, however, may be waived here, as it has been definitely determined, both in Oklahoma and in Texas, that the owner may be regulated in the production of oil and gas, regardless of his property right, in order to prevent waste.

The Champlin Case, however, is distinguished from the case at bar, because of the dissimilarity in the facts in the two cases. In the Champlin decision the matter dealt with was oil, and the court made it very clear that its finding was based upon the fact that physical waste, both below and above the surface, was indicated. Oil in excess of the market demand was being produced with the resultant loss incident to earthen storage, evaporation, fire hazard, and other mishaps, and the court held that its taking could be regulated despite the fact that the effect of the order was to require Champlin to purchase oil for his requirements from other producers.

In the present case, as we have heretofore noted, there is an absolute lack of evidence to show physical waste, either above or below the surface. There is no water problem in this gas field, no evidence of channeling, coning, or entrapment, nor any other condition shown by the record which might involve physical injury to the gas structure there. Gas is not susceptible to storage as is oil, but, on the contrary, on being brought to the surface is immediately transported through pipes to the burner tips, and from there delivered to the consumers.

There is no way, under the facts in this case, in which the enforcement of the order of the commission can save any gas or conserve any gas or result in any other thing save the requiring of complainants to pur-

chase gas from other owners without markets in order to fulfill their requirements.

Accordingly, it is obvious that the decision in the Champlin Case is not authority for the position taken by defendants here.

■ As we have frequently held in other cases, we are not concerned with the motives animating the commission in passing these orders, but only with the relation of the orders to the power which they purport to exercise. If this order fell within the scope of a valid power delegated by the Legislature, it would be immaterial if the effect of the order was to force complainants to purchase gas from other producers. However, the bald fact stands out that the order of the commission was not passed in pursuance of any power delegated to it to prevent waste, but had its spring in the persistent determination to afford to the owners of these wells in the Panhandle area which have no market part of the market developed and served by those producers having market facilities.

It is not necessary in this case to pass on the question as to whether the Legislature has the authority to effect any such result. It is sufficient to say that so far it has not passed any statute which does so.

In view of what has been said, it follows that the order attacked is void, as constituting a taking of complainants' property without due process.

■ However, defendants contend that plaintiffs are without standing in equity, in that they have made no motion for a rehearing before the commission nor applied in any way for a modification or change of the order of December 30 prior to appealing to the court.

The statute makes no provision for, nor requirement of, such a proceeding. No provision is made either by statute or the order for a stay pending the filing of such a petition for rehearing or modification. Plaintiffs' constitutional rights having been invaded, they were entitled to invoke the protection of the courts. The point is ruled against defendants by such cases as Prendergast v. New York Telephone Co., 262 U. S. 43, 43 S. Ct. 466, 67 L. Ed. 853; Porter v. Investors' Syndicate, 286 U. S. 461, 52 S. Ct. 617, 76 L. Ed. 1226, and many others unnecessary to allude to. See, also, the late People's Petroleum Case.[1]

What has been said makes it unnecessary to pass upon complainants' contention that the order constitutes a burden on interstate

---

[1] Not for publication.

commerce and impairs the obligation of existing contracts, inasmuch as we have held that the order is in excess of any delegated legislative authority and has no reasonable relation to the valid exercise of any police power. Those holdings are determinative of the matters at issue here. In this connection, however, it might be noted that the Supreme Court has made it very clear in the Champlin Case that valid regulations applying to production constitute essentially the supervision of a mining operation and do not constitute a burden on interstate commerce, even though the product obtained is intended to be, and in fact is, immediately shipped in interstate commerce.

■ Furthermore, it is well settled that in cases where the facts justify the exercise of police power the statute or order will not be stricken down because their necessary effect is to interfere with the performance of existing contracts.

It accordingly follows from what has been stated that we are of the opinion that the order of December 30, 1932, is unenforceable as against the complainants, and that they are entitled to their injunctive relief against that order as prayed.

Counsel may present a proposed decree in accordance with this opinion.