**CONSOLIDATED GAS UTILITIES CORPO-
RATION v. THOMPSON et al.**

**TEXOMA NATURAL GAS CO. v. SAME.**

Nos. 539, 550.

District Court, W. D. Texas.

March 30, 1936.

C. C. Mount, of Oklahoma City, Okl., J. J. Hedrick, of Chicago, Ill., and Morgan, Culton, Morgan & Britain, of Amarillo, Tex., for complainants.

Wm. McCraw, Atty. Gen. of Texas, and Wm. C. Davis, T. F. Morrow, W. J. Holt and Wm. Madden Hill, Asst. Attys. Gen. (C. C. Small, of Amarillo, Tex., Maurice Cheek, of Fort Worth, Tex., Alvin F. Molony, of Tulsa, Okl., and Charles I. Francis, of Houston, Tex., of counsel), for respondents.

Before HUTCHESON, Circuit Judge, and McMILLAN and KENNERLY, District Judges.

HUTCHESON, Circuit Judge.

On amended pleadings bringing down to date[1] the proration orders of the commission plaintiffs complain of, these causes went on January 6, 1936, to final hearing on their merits.

Though complainants' attacks were leveled against both the statute, House Bill No. 266 (Acts of Texas 1935, c. 120, Vernon's Ann.Civ.Stats.Texas, art. 6008), and the orders of the commission, the primary attack was, it was bound to be, on the orders; for none of the matters of which complaint is made are the result of the self-execution of any of the provisions of the statute. They arise on, they exist, only because of the orders. The act is under attack only if and to the extent that it supports the complained of orders. Both act and orders are greatly comprehensive. The act declares the policy of the state in the conservation of natural gas and the prevention of waste in its development and production, and provides broadly for its administration by the commission. It classifies gas as sweet and sour, fixes the uses to which each kind of gas may be put, authorizes the zoning of fields for the purpose of their regulation and administration, directs the commission in the discharge of duties imposed and powers conferred, and provides penalties. The specific sections of the statute involved here are sections 10 to 20, Vernon's Ann.Civ.Stats. of Texas, art. 6008.[2]

---

[1] Texas Panhandle Gas Co. v. Thompson (D.C.) 12 F.Supp. 462.

[2] Section 10 directs the commission to prorate and regulate the production of gas from each common reservoir, for the protection of private and public interests, (a) in the prevention of "waste as * * * defined herein," (b) "in the adjustment

The orders under attack, particularly that of December 10, 1935, are, as to the area in question, the Panhandle district of Texas, like the statute, conceived and couched in comprehensive terms, and purport in accordance with the statute, to bring the whole field under a comprehensive plan of regulation and control. Upon a full recitation of the history of the field, physical, political, and legal, which we adopt as substantially correct,[3] in general this plan created two zones, the eastern

of correlative rights and opportunities of each owner of gas in a common reservoir to produce and use or sell such gas as permitted in this Article." The remaining sections direct when and how the commission shall discharge the duties imposed and exercise the authority conferred.

These sections provide for the hearing and determination of waste and market demand and for zoning fields. They designate the limits within which restrictions may be imposed and generally lay out and prescribe the commission's course in discharging its agency.

[3] Special Order Fixing Allowable Production of Sweet and Sour Natural Gas in the Panhandle District of Texas.

" * * * The Panhandle oil and gas field structure lies along a buried mountain range known geologically as the Amarillo Arch, that extends along the length of the field, continuing in a southeasterly course into the southwesterly portion of Oklahoma, where it comes to the surface as the Wichita Mountains, at an elevation of approximately 1000 feet above sea level. The field is a belt lying in a southeasterly northwesterly direction and extends from eastern Wheeler County to northern Moore County, Texas. It is approximately 124 miles in length with an average width of approximately 20 miles, containing 1,504,386 acres; there being 1,066,662 acres of sweet gas, and 437,-724 acres of sour gas territory. The field is located in the counties of Hartley, Moore, Hutchinson, Potter, Carson, Gray and Wheeler. The oil producing area covers a belt about 90 miles in length lying on the northeast flank of the structure.

"The oil and gas so far encountered in the Panhandle Field has been found, with minor exceptions, in four separate strata; namely the dolmite, and arkosic-dolmite, the gray limestone and the granite wash. These four formations overlie one another, and though they are normally separated one from another by impervious strata, they are interconnected as is shown by the fact that the virgin pressure of the oil and gas from all of them was 430 pounds per square inch at sea level, regardless of the location in the field.

"Gas was first discovered in northern Potter County, Texas, in December 1918, and was encountered at a depth of 2,605 feet. The gas production for several years was developed only incidentally in the search for oil. The first important oil was discovered in 1925 and the major oil pools were developed in 1926 and 1927. The development of the gas field became prominent about 1926, and continued until 1929 when it was temporarily halted by the 'depression.' Since 1933, the gas field has been developed at a very rapid rate.

"The oil wells in the oil pools in the field were, as a general rule, drilled through one or more gas-containing strata before entering the oil-containing stratum, 'and, in many instances, the wells were so completed as to cause production of gas from the gas strata along with the oil and gas from the oil stratum, with the result that tremendous quantities of gas have been produced with the oil, large portions of it coming from gas-producing strata above the oil-producing strata. This gas was in large part blown into the air, and it has been estimated that in excess of two trillion cubic feet of gas produced in this manner has been wasted into the air.

"Coincident with the development of the Borger pool casinghead gasoline plants were erected therein in which considerable portions of the gas produced therein were processed for the extraction of the gasoline content thereof, and, there being no market for the stripped gas, called 'residue gas' resulting from the operation of said plants, the bulk of such residue gas was wasted into the air. In varying degrees, the same is true of the other oil pools as they were developed and operated.

"The Panhandle Field is so far removed from centers of population and industrial activity that little value was at first placed upon the enormous quantities of gas therein found, but, due to the development of the casinghead gasoline plants and the resultant abundant supply of cheap residue gas that was being wasted into the air, the carbon black industry was attracted to the area, and in September 1926, the first carbon black plant was completed. It was located in the Borger pool, and proceeded to burn considerable quantities of such residue gas for the manufacture of carbon black. Thirty additional carbon black plants have since been built and placed in operation in the field. The combined throughput capacity of said plants is approximately 570,000,-000 cubic feet of gas daily. In excess of

and the western, fixed the drainage area of each well in each of these zones, and, in the Western Panhandle field, where alone sour gas was found to exist, established a line of demarkation between sweet and sour gas areas.

Plaintiffs do not complain of the zoning provisions of the order. Neither do they complain of the statute or order demarking sweet from sour gas areas and dedicating gas from the wells in each area to the uses the statute provides. Their complaint is

70 per cent of the carbon black manufactured in the United States is being manufactured in the Panhandle Field.

"There are, at present, 1090 natural gas wells in this field. These wells have a total daily open flow potential of 17,231,183 M.C.F. Of this total 225 wells produce sour gas, and these wells have a total open-flow potential of 2,099,985 M.C.F. daily. In the oil producing belt there are 2,527 oil wells producing from 27 different pools.

"Development throughout the Panhandle Field has long since proved it to be the largest known reserve of natural gas in the United States. The demand for gas for light and fuel uses was local and was relatively small, prior to 1926.

"The construction of pipe lines began in January, 1926, when the Northern Texas Utilities Company started transporting gas to towns in northern Texas, the principal one of which was Wichita Falls. In July of 1927, the Lone Star Gas Company started running gas in Northern Texas, principally into Ft. Worth and Dallas. In the early part of 1928, the South Plains Pipe Line Company and the Cities Service Gas Pipe Line Company started transporting gas from this field, the former into towns south of Amarillo in West Texas and the latter to Kansas City, Missouri. In June of that year the Canadian River Gas Company began transporting gas into Colorado, principally into the cities of Denver and Pueblo. In November of that year Texas Panhandle Gas Company began using its line to transport gas into Oklahoma and to Wichita, Kansas. There was relatively little development by pipe lines from this time until June of 1931, when the Panhandle Eastern Pipe Line Company began transporting gas through its line as far as Indianapolis, Indiana.

"In October of 1931, the Texoma Natural Gas Company began its operations. The gas transported by this line was carried to markets in Nebraska, Iowa, and Illinois, the principal market being Chicago and its vicinity. In May of 1932, the Northern Natural Gas Company began its operations in which it transported gas into Nebraska and Iowa, principally into the towns of Des Moines, Iowa, and Minneapolis and St. Paul, Minnesota.

"The total length of these nine major pipe lines approximates 4,425 miles, and the total capacity thereof is approximately 1,000,000,000 cubic feet of gas per day.

A daily average of approximately 300,000,000 cubic feet of gas was transported from the Panhandle Field through these lines during the year 1933 and a daily average of approximately 400,000,000 cubic feet of gas was being transported through said lines during the year 1934; and the daily average amount being transported there through at the present time is approximately 450,000,000 cubic feet.

"These major pipe line companies acquired and now hold under lease approximately 850,000 acres of land, which is about 61 per cent of the total gas producing area in the Panhandle Field, each such company separately owning and operating its own leases. Of the total area proven productive of sweet gas these major companies own approximately 80 per cent. They have not and are not taking or transporting sour gas through their lines. Unless such gas is treated, it is not suitable for light, fuel and domestic uses. The demand for sour gas for light and fuel uses is restricted to isolated lease purposes.

"Six or seven of the major pipe line companies have produced and transported to the markets gas produced from only their own gas leases (or the leases of their respective affiliated or subsidiary companies), and have not purchased gas from other lease owners in the field. Prior to and since the passage of said Act, many of the un-connected lease owners have repeatedly endeavored to induce those companies to purchase gas from their lands, but without avail. Some of these companies have been and are willing to purchase gas ratably in the field, if all the others would do so, and two companies have made thirty (30) new connections and are taking ratably from these connections.

"In addition to the major pipe lines there are ten additional pipe lines of lesser capacities serving local towns and cities in the immediate vicinity of the field, with a throughput capacity of approximately only 65,000,000 cubic feet of gas per day. For the most part, these small pipe line companies own their own leases and supply their requirements therefrom, although some of them purchase some of their requirements from other lease owners. Nevertheless, a very large number of separately owned leases have remained without connections with market outlets. In fact, there are more than 90 gas wells that have never had a connection. The

general against the provisions of the order which, fixing an allowable production from plaintiffs' wells below the amount they require and have been taking from their wells to serve their customers' needs, makes it compulsory upon them to purchase from the wells of others gas of which plaintiffs have an already ample supply. Their claim as to these provisions is that since it is undisputed that plaintiffs are and always have been producing their wells without waste of any kind, the order as to plaintiffs is not a waste order, but as all the prior orders have been, simply one designed to furnish markets to those having none. They insist that these pretended proration, but in reality reduction, orders are invalid, (1) because not authorized by the statute they purport to administer, and (2) be-

cause they take plaintiffs' property without due process of law, and deny them the equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States and of sections 16, 17, and 19 af article 1 of the Constitution of Texas.

As to the statute, they complain of it as violative of the constitutional provisions above invoked only if it be held to support the orders. Their complaint on this score is general, it goes not merely to the particular scheme, but to any scheme of proration the commission may devise. Their insistence is that no scheme of allocation or proration which is designed to and will curtail complainants' production, and by preventing their taking their own gas, compel them to buy from adjoining well owners

---

pipe line companies, large and small, have taken up all the markets economically and practically available for sweet gas from the Panhandle Field, and their control thereof constitutes a virtual, if not an actual, monopoly of said markets.

"The policy of most of the pipe line companies operating in this field to take gas from only those wells which they owned, to the exclusion of the other operators in the field has resulted in a protracted controversy between them and those operators in this field without a market. This controversy resulted in the passage by the Legislature of the State of Texas of a number of bills, all of which had as their purpose the protection of the right of those operators to sell their gas. In 1931 the Forty-second Legislature passed what is known as the Common Purchaser Act. This law required that pipe line companies taking gas in the State should be considered as a common purchaser and should take gas ratably under conditions which should be prescribed by the Railroad Commission of Texas. As a result of this Act the Railroad Commission issued orders which had the effect of requiring the distribution of the markets of the pipe line companies among the various producers in the field in proportion to the daily open-flow potentials of the wells owned by those producers. This law was attacked by several of the gas pipe line companies in the United States District Court for the Western District of Texas and the Statute and the Orders of the Railroad Commission issued thereunder were stricken down.

"As a result of the failure of the Common Purchaser Act, the Second Called Session of the Forty-second Legislature passed an Act which provided that the Railroad Commission should determine

the market demand for any particular field, and should allocate the production in this field among the various producers to meet this market demand. The Orders entered by the Railroad Commission as a result of this Act were again attacked by the same pipe line companies in the United States District Court for the Western District of Texas and were stricken down.

"As a result of the failure of these Legislative attempts to obtain ratable production, there was passed by the First Called Session of the Forty-third Legislature a bill known as the Stripping Law or the Sour Gas Bill. This bill, in effect, gave to the Railroad Commission the power to permit the use of natural gas for any beneficial purpose. Before the passage of this bill, it had been the policy of the Railroad Commission to permit the use of casinghead gas only in stripping operations, but after its passage, the Railroad Commission began issuing permits to strip dry natural gas. As a result of the issuing of these permits, a number of gasoline plants were built and began to operate in the field.

"During the fall of 1933 and the year 1934, five gasoline extraction plants were built and began operations. In addition, most of the gasoline plants which had been operating entirely on casinghead gas were converted into stripping plants. As a result of these developments, by the fall of 1934, in excess of one billion cubic feet of gas was being blown into the air daily. These operations so rapidly depleted the gas field that it soon became evident that some other solution of the problem must be obtained. Hence, in the spring of 1935, the Forty-fourth Legislature passed a comprehensive conservation Statute known as House Bill No. 266, the purpose of which was to prevent waste and compel ratable production."

can be constitutionally applied against them. They insist that the proof is clear and abundant, in fact, that it is admitted, that from the beginning they have conducted their operations prudently and without waste, and have taken for their use only a small part of what they own. Especially do they insist that the orders are partial and unjust as to them, for not only have they not injured their neighbors by excessive takings in proportion to their holdings, but they have themselves been greatly victimized by the excessive, exorbitant, and wasteful takings, of well owners from whom the orders in question, if enforced, will compel plaintiffs to buy back their own gas already diverted from under their land.

In subordination to this general complaint, and only in the event it be not sustained, plaintiffs complain of the order in the particulars to which it has descended in providing the proration scheme, as not in accordance with the statute it purports to rest on, and also as violative of the constitutional provisions already invoked. The particulars of which they complain are that in the purported effort to comply with the legislative direction[4] for fixing the daily allowable for each gas well in a common reservoir, the respondents have departed from it and have unjustly, unfairly, and unreasonably fixed their allowable. They have fixed it by arbitrarily disregarding factors the statute fixed as controlling, and arbitrarily selecting a standard or basis having no reasonable relation either to the legislative directions or to the physical situation. Instead of taking into account, as the statute requires, the size of the tract, its producing capacity, and the actual drainage area of each well, the commission has arbitrarily fixed the drainage area of each well in the Eastern Panhandle field at 160 acres, in the Western Panhandle field at 640 acres, and has fixed the allowable of each well by an arbitrary formula allowing 50 per cent. based on the potential of the wells, and 50 per cent. based not on the real drainage area, but on the acreage the commission has arbitrarily assigned to each well. (2) It has made this more arbitrary by extending this formula of acreage influence to tracts very much smaller in size, thus allowing tracts held in smaller acreage ownership a greatly larger proportionate production than tracts like complainants', held in large ownership.

Respondents insist that the statute and the orders must be looked at and construed in the light of the conditions of wasteful use existing especially in the sour gas area where gas was being stripped when the statute was enacted, and in the light of the present inability of many well owners for want of light and fuel markets, to make use of their gas. They declare that every intendment should be indulged in favor of their validity, since the public interest in the conservation of gas as a natural resource of the state, the existence of wasteful conditions in portions of the Panhandle field when the statute was enacted, and the power of the state, through the commission, to put a stop to wasteful practices, are beyond question. They urge that the Legislature having these conditions in mind, intended and by the act has provided for, proration of production not only to prevent waste, but also to bring about a condition which will enable owners of wells in the field having no markets, to get their gas to market through selling it to those who have. They point to the commission's finding and order that a waste condition exists in the Panhandle field which requires proration of production, and to the proof they offered here to support it. They point to the admitted fact that there are wells in the sweet gas area of each of the Panhandle zones which under the present stat-

---

[4] Vernon's Ann.Civ.St. art. 6008, § 13: "In determining the daily allowable production for each gas well the Commission shall take into account the size of the tract segregated with respect to surface position and common ownership upon which such gas well or wells are located; the relation between the daily producing capacity of each gas well and the aggregate daily capacity of all gas wells producing the same kind of gas in the same common reservoir or zone; and all other factors which are pertinent; provided that the Commission shall not take into account the size of the tract upon which any gas well or wells are located in excess of the efficient drainage area of such well or wells, producing at twenty-five per cent (25%) of the daily productive capacity, which drainage area shall be determined by the Commission. In ascertaining the drainage area of a well, the Commission shall take into account such factors as are reflected in the productive capacity of a gas well, including formation pressure, the permeability and porosity of the producing formation, and the well bore's structural position, together with all other factors taken into account by a reasonably prudent operator in determining the drainage area for a gas well."

ute restricting the use of that gas for light and fuel have no outlet for their gas, unless complainants and other pipe line companies will buy it from them. They insist that the order must be sustained both on the ground that it has a reasonable relation to the prevention of waste in the field generally, and on the ground that apart from waste it is valid as a "correlative rights" measure, a measure for the protection of well owners who under the statute as it now stands will have no market for their gas, unless complainants and others be compelled to buy from them. Complainants on their part insist that it appears beyond question from the recitals in the commission's order and from the evidence in the record that as to them the order was not designed for it has no relation to the prevention of waste. That it was designed for, relates to, and effects only the dedication of plaintiffs' markets and facilities to the wishes and needs of well owners having none, by instituting indirectly a scheme of compulsory purchase.

On the preliminary hearing, we were of the opinion and so wrote that the statute in question was a waste statute. That it had not attempted, except in connection with and as a part of waste prevention, to authorize the proration of production. We held further that if the Legislature meant to say that without regard to questions of waste persons who had provided themselves with markets should, merely because other well owners had none for their gas, be prevented from taking their needs from them, the law would on its face be a class law, unjust and partial. We held that designed as it would be to take the property of one class to devote it to the use of others, it would constitute a taking of property without due process, a denial of the equal protection of the laws. On that hearing ·the idea was advanced by those who appeared on the side of the commission, but in actual representation of those whose wasteful uses the present law forbids, that the Legislature wished to prohibit the use of gas for wasteful purposes but was unwilling to do so except upon the condition that these persons be supplied markets for the permitted use. That in order to placate those whose wasteful uses it had forbidden, the Legislature had enacted a law designed to supply them with markets by compelling those having facilities and markets to buy from them. We rejected that contention. It is not, as we understand it, reurged.

We held also that the proof tended to, if it did not wholly, overthrow the claim that the order was a real waste order, looking toward and having a reasonable relation to waste prevention. We thought the order as to plaintiffs was, as the orders enjoined in the three previous cases had been, merely orders having the purpose and result to accomplish the unlawful end, of in effect expropriating the property of one and forcibly giving it to the use of others. On this hearing a vast amount of testimony was offered, illuminating the actual physical conditions in the entire field. A considerable part of it consisted of opinion evidence more or less expert; opinion evidence as to practical facts and conditions which could be checked and rechecked with the physical conditions observed in the field. This opinion evidence, in most particulars indeed as to the controlling, the real points in the case, was on the whole without conflict. There was in addition some opinion evidence offered in the case on the ultimate question tendered for trial and decision, that is, whether the orders bore any just or reasonable relation to the prevention of waste, in the sweet gas field. These opinions were of an order of proof having little if any probative force, because no more than speculation, surmise, and conjecture, the opinion of witnesses on the ultimate fact for decision, a kind of evidence universally held insufficient to constitute proof. Miller v. United States (C.C.A.) 71 F.(2d) 361; United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617; United States v. Bass (C.C.A.) 64 F.(2d) 467; United States v. Sauls (C.C.A.) 65 F.(2d) 886; United States v. Harris (C.C.A.) 79 F.(2d) 341; People's Petroleum Producers v. Smith (D.C.) 1 F.Supp. 361.

A careful consideration of the record as it relates to waste in the Panhandle field as a whole leads us to these conclusions: (1) Before the going into effect of House Bill No. 266, grossly wasteful practices were going on in parts of the field with the result that enormous quantities of gas were wasted. (2) No substantial evidence was offered, indeed, it was not even seriously claimed that anything complainants had done or contemplated doing has in the slightest degree contributed or will contribute to that waste. The statute as it now exists prohibits the use of sweet gas, except for light and fuel. As regards these uses, it is undisputed that there has not been, there is not now, and in reasonable

probability there will not be, at least at any time in the near future, any waste, for the demand for these uses is not only limited but in supplying it, on account of the nature of the uses, only the most prudent and non-wasteful practices may be, are being and will be employed. The only kind of gas plaintiffs have is sweet gas. The proration order as to them was as to such gas. As to gas for these uses, there is not, there never has been, a real market in the field, for except for a small quantity consumed in operating wells and plants, gas for this use is not sold in the field. It is transported on contracts to distant points for delivery at the burner tips. The commission's proration order was therefore based not upon market demand in the field, but upon the amount required by plaintiffs and other pipe lines for supplying their customers at distant points. This allowable was designedly fixed at a point sufficiently below their full needs as to require plaintiffs to fill these needs from wells without markets.

■ (3) In view of these facts, there is no credible evidence to justify the conclusion that as applied to these complainants, the restriction of their production below their absolute needs was in the slightest related to the prevention of waste of gas, or as to them, would have any reasonable purpose or effect whatever, except to furnish a market for those whose prior wasteful uses of gas the Legislature now prohibits. We therefore reject, as without basis in the record, the claim of respondents that the orders must be sustained as waste measures, enacted to prevent waste with an eye single to the performance of that duty and function, and find instead that they are orders enacted to bring about a compulsory purchase upon the theory of protecting correlative rights.

■ We come then to defendants' insistence vigorously urged upon us that we erred in our former opinion in holding that the statute did not authorize the commission, upon considerations alone of providing markets for gas well owners without them, to effect marketing arrangements between those who had and those who had not markets, by ordering the amount of the required production from wells having markets, to be prorated over all gas wells in the field. We are not shaken in that opinion. We think it quite clear that the Legislature did not seek to exert such power. In deference,

however, to the elaborate attack of respondents upon that ruling, and their urgency and insistence that we reconsider it, we will set out more fully our reasons for thinking so.

(1) The plain terms of the act, in their own light, in the light of the history of the regulation for conservation of oil and gas and of the particular conditions under which it was passed, make it abundantly clear that this act is designed to implement the commission in dealing with the glaring and patent waste problems which the Panhandle and other gas fields presented. The declaration of policy contains nothing to bear out the claim that independent of waste prevention the Legislature was instituting a new rule of property in Texas. What we said in Canadian River Gas Co. v. Terrell, 4 F.Supp. 222, 226, as to the gravity and seriousness of the problem involved in such an attempt to change the laws and that an intention to do so would not be lightly imputed to the Legislature, applies to this statute. Its declaration of policy does not declare that the statute was enacted to declare and define correlative rights, to compel one having markets to share them with another, to create a new rule of property, and authorize the commission to ascertain and settle, without judicial intervention, rights in a gas field. It simply declares that in recognition of past, present, and imminent evils occurring in the production of natural gas as the result of waste in the production and use thereof, in the absence of correlative opportunities of owners of gas to produce and use the same, it was enacted for the purpose of prohibiting waste and compelling ratable production.

Section 10 (Vernon's Ann.Civ.St.Tex. art. 6008, § 10) couples the adjustment of correlative rights with the prevention of waste, and section 11 (Vernon's Ann.Civ. St.Tex. art. 6008, § 11) specifying the conditions under which the power granted shall be exercised, still couples them. Nowhere in the act is there any provision which in terms or by reasonable construction can be construed as authorizing the commission to prorate production, waste apart, on considerations of sharing markets. This we think is the necessary, the inescapable construction of the act, if all constitutional questions are laid aside. When its construction is approached in the light of constitutional limitations, the conclusion is further compelled that the statute

was not intended to have, it cannot be given, the meaning respondents contend for.

■ It is the duty of courts to give a constitutional, rather than an unconstitutional, construction to a legislative act, to give it a meaning if its terms permit of it, which does not put it in opposition to the fundamental law. That principle applied here imperatively demands that we reject the construction respondents insist upon, for that construction would place the act in direct and fatal opposition to both State and Federal Constitutions.

It is significant to note that in not a single case of the many cited by respondents has the attempt been made to exert the power of regulation by way of forcing one to buy from another. In every one of them the question of the rights of owners in a common pool has come up in connection with, and only in discussion of a waste measure. In every case where the question of correlative rights has come up, it has been discussed collaterally. In every case the spearhead of the state's thrust has been its conservation powers, its right, in the public interest, to conserve its natural resources. What the courts have said of correlative rights has been said incidentally. It has come up in connection with a discussion of the consequences and effect of waste, and the right to prevent those consequences. In contending otherwise, respondents, we think, misread the cases. In no case in Texas, except in this case, and the Canadian River Case, supra, has the question of the power of regulation, for the sole purpose of preserving correlative rights, been raised. In Brown v. Humble Oil & Refining Co. (Tex.Sup.) 83 S.W. (2d) 935, 99 A.L.R. 1107, a leading Texas case, correlative rights were discussed in connection with a waste statute and order. The whole jurisdiction in that case was grounded on a waste statute. It was exerted as a part of the duty to prevent waste. Considerations of preventing waste have been the genesis of every gas and oil law passed on by every court which has been cited to us or which we have found. The Ohio Oil Case (Ohio Oil Co. v. Indiana), 177 U.S. 190, 20 S.Ct. 576, 581, 44 L.Ed. 729, on which respondents place their main reliance, was of precisely that kind. Putting to one side all questions of the difference between the rules of property in gas and oil in Indiana and in Texas, and taking that case at its fullest value for respondents, it decided nothing but that in

the interest of waste prevention the complete wastage of the gas by popping it into the air, the Legislature could control gas production to the extent of preventing its being used as a gas lift for oil. What was said about correlative rights was said only incidentally. The real decision is found in this supposition and its vigorous denial.

"It is certain, if there can be no authority exerted by law to prevent the waste of the entire supply of gas and oil, or either, that the power which exists in everyone who has the right to bore from the surface and tap the reservoir involves in its ultimate conception, the unrestrained license to waste the entire contents of the reservoir by allowing the gas to be drawn off and to be dispersed in the atmospheric air, and by permitting the oil to flow without use or benefit to anyone."

This denial all subsequent courts have sustained.

Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 72, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas.1912C, 160, on which respondents especially rely, illustrates the point. There as particularly shown in the New York decisions on which that opinion was based, Hathorn v. Natural Carbonic Gas Co., 194 N.Y. 326, 87 N.E. 504, 23 L.R.A.(N.S.) 436, 128 Am.St.Rep. 555, 16 Ann.Cas. 989, and People v. New York Carbonic Acid Gas Co., 196 N.Y. 421, 90 N.E. 441, the validity of the statute was expressly grounded upon the authority of the state to prevent the waste of its natural resources. On page 73 of 220 U.S., 31 S.Ct. 337, 338, 55 L.Ed. 369, Ann.Cas.1912C, 160, it is said:

"The court of appeals of the state * * * construed this provision, not as prohibiting the specified acts absolutely or unqualifiedly, but only when the mineral waters are drawn from a source of supply not confined to the lands of the actor, but extending into or through the lands of others, and then only when the draft made upon that source of supply is unreasonable or wasteful, considering that there is a coequal right in all the surface owners to draw upon it. In other words, the court, by processes of interpretation having its approval, read into the provision an exception or qualification making it inapplicable where the waters are not drawn from a common source of supply, and also where, if they be drawn from such a source, no injury is done thereby to others having a like right to resort to it."

So Walls v. Midland Carbon Co., 254 U. S. 300, at page 313, 41 S.Ct. 118, 120, 65 L.Ed. 276, after all of the discussion was over and done, came to the same point, the court saying:

"The question in the case is, as we have said, whether the legislation of Wyoming is a valid exercise of the police power of the state, and brings into comparison the limits of the power as against the asserted rights of property, whether it, the legislation, is a legal conservation of the natural resources of the state, or an arbitrary interference with private rights."

Discussing the Indiana Case, which respondents say was not a waste case, the court said of it:

"The suit was by the state, and was based upon a statute which was directed against and prohibited one having possession or control of any natural gas or oil well to permit the flow of gas or oil from any such well to escape into the open air. * * * From the standpoint of the law, to do so was a waste of gas. A right against the statute was set up, based upon the asserted or implied postulate that the owner of the land owned all beneath the surface and all that could be brought to the surface within the lines of the land. The postulate was rejected, upon the ground of the nature of the gas, the capability of its flow from place to place, the common right to domestic and industrial use of it and the power of the state to regulate and conserve such right. * * *

"It was hence decided that the power of the state 'can be manifested for the purpose of protecting all the collective owners, by securing a just distribution to arise from the enjoyment by them of their privilege to reduce to possession, and to reach the like end by preventing waste.' "

People v. Associated Oil Co., 211 Cal. 93, 294 P. 717, 722, affirmed as Bandini Petroleum Co. v. Superior Court, 284 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136, 78 A.L.R. 826, contains an interesting and complete discussion of the question of the relation of waste and correlative rights. Of the Ohio Oil Co. Case, the leading case on the power of a state to prevent waste by the escape of natural gas, the court said:

"There is considerable discussion in that case concerning the protection necessary to be accorded the correlative rights of adjoining landowners in the same field, and the petitioners herein seek to confine the holding of the Supreme Court in that case

to the protection, under the exercise of the police power, of those correlative rights. But the holding in that case cannot be so limited. The decision in that case defines the so-called correlative right not necessarily as a right to a fixed distributive or proportional share of the oil and gas underlying the surface, which no other owner of soil overlying the same reservoir may take and use beneficially, but as a coequal right to take whatever of the oil and gas can be captured, so long as waste, as defined by the statute, is not committed."

This is the substance and the effect of all the legislative acts and of the decisions of the courts to which we have been directed. As far as we are advised, no Legislature has yet enacted a law, no court has yet construed one, which in the interest solely of securing to each his rightful share of oil or gas in a common pool or reservoir has in a comprehensive and complete way undertaken to provide machinery for determining and securing these rights and for fixing the takings of each owner from the reservoir in accordance therewith. We do not say that no Legislature can do this. We do not say that because it is a new kind of exertion of police power, it must be held to be beyond the scope of it.

"The police power of a state, in a comprehensive sense, embraces its system of internal regulation, by which it is sought, not only to preserve the public order and to prevent offenses against the state, but also to establish, for the intercourse of citizen with citizen, those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment, of his own, so far as is reasonably consistent with a like enjoyment of rights by others." Cooley on Constitutional Limitations, p. 572, quoted in People ex rel. New York Electric Lines Co. v. Squire, 107 N.Y. 593–605, 14 N.E. 820, 824, 1 Am.St.Rep. 893.

By force of this doctrine it may be that by a complete, a comprehensive scheme which, consistent with due process, considers and has due regard for the rights and equities of all, the Legislature of Texas can provide by law for an equitable ascertainment, partitioning and fixing of them so that each could take only what was thus determined to be his own. We do not say that it cannot do this. We say merely that it has not done so. We say that House Bill No. 266 cannot be said to have either this object or this effect.

In the first place, it considers only wells actually drilled. No cognizance is taken of the great amount of undrilled territory. In the second place, even as to wells already drilled, it makes no provision for a definite and final ascertainment, partition, and setting aside to each owner of the amounts he is entitled to draw from the reservoir. It provides merely for a temporary, and therefore arbitrary allocation to each well owner of a part of the contract market of some of them. The evidence makes it plain that complainants have been taking gas in an orderly fashion, and in a total far less than under any equitable theory of measurement would be apportioned to them, while some of those in whose interest under the notion of correlative rights the orders seek to administer the act, have been taking it exorbitantly, disproportionately, and wastefully. No provision is made in the act for taking into account these and many other matters which must be considered if any equitable and fair distribution between adverse interests is to be attempted.

In addition, if the act be construed as intended to appoint the commission as a body to ascertain and partition rights of oil and gas owners, it would be a palpable and direct violation of section 1, article 2, of the Constitution of the state of Texas, in that, contrary to that provision, it would be an attempt to delegate to the commission both legislative and judicial powers, leaving to it at will by regulations of its own devising, to take from one and give to others, rights in property. A roving commission of this kind, to undo and set up, to take away and restore, the property rights of the people, may not be thus delegated. Board of Water Control v. McKnight, 111 Tex. 82, 229 S.W. 301; Dockery v. State, 93 Tex.Cr.R. 220, 247 S.W. 508; City of San Antonio v. Zogheib (Tex.Civ.App.) 70 S.W.(2d) 333. Cf. Panhandle Eastern Pine Lumber Co. v. Highway Commission, 294 U.S. 613, 55 S.Ct. 563, 79 L.Ed. 1090.

Because of the view we entertain and have expressed that the commission is entirely without power under the act to prorate plaintiffs' production on a theory of correlative rights, and because there are no waste conditions in the sweet gas area, it is equally without power to prorate it on the theory of waste, we find it unnecessary to consider or decide the subordinate questions complainants raise on the orders. On the view we take of the case before us the

particular formulas the commission has now adopted, the particular bases it has assumed for its proration, are unimportant. The evidence makes out a case for relief because it is plain, so that all may see, that under the statute as it now exists there are no waste conditions in the sweet gas area which the order is designed to or will remove or affect; but masked under the guise of regulation, it is the exercise of coercion to take from one to give to another.

The force of government in America may not be exerted to bring about such partial, such unjust effects.

"Recognizing the difficulty in defining with exactness the phrase 'due process of law,' it is certain that these words imply a conformity with natural and inherent principles of justice, and forbid that one man's property, or right to property, shall be taken for the benefit of another, or for the benefit of the state, without compensation." Holden v. Hardy, 169 U.S. 366, 390, 18 S.Ct. 383, 387, 42 L.Ed. 780.

"Justice is the bond of men in states, and the administration of justice, which is the determination of what is just, is the principle of order in political society." The Politics of Aristotle, p. 5 (World's Great Classics).

"Justice is the end of government; it is the end of civil society. It ever has been and ever will be pursued until it be obtained, or until liberty be lost in the pursuit." The Federalist, No. 50.

"Governments have in general but two means of overcoming the opposition of the people they govern, viz: the physical force which is at their disposal, and the moral force which they derive from the decisions of the courts of justice. * * *

"The great end of justice is to substitute the notion of right for that of violence, and to place a legal barrier between the power of the government and the use of physical force." DeTocqueville, Democracy in America, p. 138.

This is the principle of Democracy in America; the spirit of its laws.

The Fifth and the Fourteenth Amendments to the Federal Constitution, and article 1, § 17, of the Texas Constitution, are based upon a recognition of this principle. Because they are, though they do not operate to prevent the reasonable and just exercise of the police power of the state, they do limit its exertion within just and reasonable bounds.

"The police power of a state, while not susceptible of definition with circumstantial precision, must be exercised within a limited ambit and is subordinate to constitutional limitations. It springs from the obligation of the state to protect its citizens and provide for the safety and good order of society. Under it there is no unrestricted authority to accomplish whatever the public may presently desire. It is the governmental power of self-protection and permits reasonable regulation of rights and property in particulars essential to the preservation of the community from injury." Panhandle Eastern Pipe Line Co. v. State Highway Commission, 294 U.S. 613, 55 S.Ct. 563, 567, 79 L.Ed. 1090.

"Vague, shadowy, and shifting though the limits of this power sometimes appear to be, it is settled that in the exercise of the police power a state may take, damage, or destroy private property without compensation, when the public necessity, the public health, or the public safety require it to be done. Because, however, these limits are shadowy, vague, and apparently shifting, it is in the last analysis for the courts to say whether questioned action has properly called into being the exercise of the power, and whether the power is being exercised reasonably and within the limits of public necessity. Spann v. City of Dallas, 111 Tex. [350] 357, 235 S.W. 513, 19 A.L.R. 1387; * * * People's Petroleum Producers v. Sterling (D.C.) 60 F.(2d) 1041; * * * Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322, 28 A.L.R. 1321." Hulen v. City of Corsicana (C.C.A.) 65 F.(2d) 969, 970.

This controversy has been long drawn out. In varying forms under different statutes, but always to the same purport and effect as to these complainants, order after order has been drawn, enjoined, and drawn again. This is the fifth time this court has written. Texoma Natural Gas Co. v. Railroad Commission (D.C.) 59 F.(2d) 750; Texoma Natural Gas Co. v. Terrell (D.C.) 2 F.Supp. 168; Canadian River Gas Co. v. Terrell (D.C.) 4 F.Supp. 222; Texas Panhandle Gas Co. v. Thompson (D.C.) 12 F. Supp. 462. From none of these decisions was an appeal taken.

If the principles on which we have proceeded have been wrongly taken, this should be determined by an appeal. Continued litigation of these questions in the trial court will not settle them. Contested matters of this kind should be settled, litigation should be brought to an end.

A decree for complainants in accordance with this opinion may be settled and filed.