**DELAWARE VALLEY APARTMENT HOUSE OWNERS ASSOCIA-TION et al.**

v.

**UNITED STATES of America et al.**

Civ. A. No. 72–1263.

United States District Court,
E. D. Pennsylvania.

Oct. 12, 1972.

Herbert A. Fogel, Andrew Elash, Obermayer, Rebmann, Maxwell & Hippel, Leonard R. Berkowitz, Goncer M. Krestal, Blank, Rome, Klaus & Comisky, Leonard J. Bucki, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for plaintiffs.

Robert E. J. Curran, U. S. Atty., Gary Tilles, Warren D. Mulloy, Asst. U. S. Attys., for defendants.

## MEMORANDUM

HANNUM, District Judge.

Plaintiffs are the owners or managers of apartments and other rental property units subject to regulations promulgated by the Price Commission pursuant to the Economic Stabilization Act of 1970 and amendments thereto.[1] They do not challenge the delegation of legislative rulemaking power to the Price Commission. Their Complaint alleges that a regulation promulgated by the Commission exceeds the authority granted by Congress to the President to " . . . stabilize prices, rents, wages, and salaries . . . "[2] and that the regulation arbitrarily discriminates against them in violation of due process. They seek a declaratory judgment that the regulation is invalid and a permanent injunction enjoining defendants from enforcing the regulation against them. This Court must first decide whether the Price Commission had the authority to promulgate the challenged regulation. If the Commission exceeded the statutory power, the regulation is invalid and it will be unnecessary to reach the claim of discrimination.

The challenged regulation,[3] referred to as the "8 percent rule", determines the "base rent" for residences with leases of greater than one year's duration entered into before May 15, 1971 where:

(1) The "average transaction formula" method for determining "base rents" yields a figure of 8 percent or more, and

(2) the landlord demands a rent increase of 8 percent or more when the lease expires.

The term "base rent" is intended by the Price Commission to accurately reflect the market value of an apartment during the period of time just prior to the freeze of August 15, 1971. It is a floor to which future allowable increases are added. Thus, for month to month leases the most recent rent charged prior to the freeze would constitute an accurate "base rent" since the landlord had monthly opportunities to adjust the rent. For leases of longer duration than one month, signed during the 90 day period before the freeze, the Commission considered the rent specified in the lease to be a fair reflection of the market value just prior to the freeze. For leases entered into prior to May 16, 1971, the "base rent" is determined by employing an "average transaction formula". This method allows a landlord to calculate the average percentage that he increased rents on similar residences on which leases of longer than one month expired during the 90 day period before the freeze. The rent specified in the lease increased by the percent derived by use of the formula was considered to be a

---

1. P.L. 91–379, 84 Stat. 796 (1970) ; as amended, P.L. 91–558, 84 Stat. 1468 (1970) ; P.L. 92–8, 85 Stat. 13 (1971) ; P.L. 92–15, 85 Stat. 38 (1971) ; P.L. 92–210, 85 Stat. 743 (1971).

2. P.L. 92–210, § 203(a)(1).

3. See Appendix.

fair reflection of the market value just prior to the freeze.

In the Commission's view, use of the "average transaction formula" to fix "base rents" for residences upon which leases of greater than one year were expiring did not accurately reflect the market value just prior to the freeze, but rather, generated substantial inflationary increases in rents. The Commission attributes this fact to prospective leasing practices engaged in by lessors who traditionally lease residences for periods of greater than one year (generally two or three years). When a lease expires, these landlords base the new rent on their expectation of inflation over the long term of the new lease.[4] With inflation somewhat curtailed after August 15, 1971, the Commission contends that use of the "average transaction formula" by these landlords yielded increases that were unjustifiably high. The Commission states it was aware that application of the formula by landlords who traditionally write leases for periods greater than one year would result in large increases, but it assumed that these landlords would continue their traditional leasing practices, thereby spreading the large increases over several years and contributing stability to the national rent structure. The Commission contends that it became aware of many instances where rents were being increased by large amounts derived from application of the "average transaction formula" while the duration of leases was being reduced to terms of one year or less. The Commission emphasizes that this application of a large rent increase to a shorter term lease provides an artificially high floor for future rent increases. It states that the "8 percent rule" was promulgated in response to this inflationary situation.

Essentially the "8 percent rule" affords a tenant certain options if a landlord demands a rent increase of 8 per-cent or more. The landlord must give his tenant the option of a lease of the same duration as the expiring lease or a lease of one year but with an increase over the old lease rent of not more than 8 percent.

Plaintiffs contend that the regulation exceeds the authority granted to the Commission under the Act in three respects: (1) the regulation affects the length of leases while the Act grants authority only to stabilize rents; (2) the regulation is an unauthorized interference with the constitutionally protected right to contract, and (3) the term of some leases entered into because of the options required by the regulation may extend beyond the termination date of the Act. In support of their first contention, plaintiffs argue that the Commission is without statutory authority to require that a tenant be given the options specified in the regulation. Citing Amalgamated Meat Cutters & Butcher Workmen of North America v. Connally, 337 F.Supp. 737, 754–759 (D.D.C.1971), plaintiffs state in their brief:

> "It has been recognized that the Act does not give the President and his delegates a 'blank check' to promulgate whatever regulations they desire, but that such regulations must be authorized by and in furtherance of the statute." (p. 4)

The Commission argues that a landlord is not required to offer his tenant options unless he demands a rent increase of 8 percent or more, an amount the Commission considers unjustified. It is emphasized that:

> "The 8% figure is not a randomly chosen limit on the degree of inflation which will be tolerated. It was chosen to assure that this class of leases would be treated in a manner equitable and consistent with the treatment given other types of leases. The 8% consists of the 2½% allowed to all transactions, and 5.5% which is a

4. The Commission compares this approach with the retrospective pricing method used by lessors who lease for periods of one year and less. These lessors establish new rents based on costs incurred over the time of the expired lease.

base rent adjustment roughly comparable to the increase nationally in rents during the period May 25, 1970 to August 15, 1971." [5]

The Commission further argues that the regulation involves the least possible disturbance to traditional leasing practices consistent with the statutory objective of stabilizing rents. To the extent the tenant's options, when applicable, will affect the length of leases; the Commission contends this effect is incidental to the stabilization of rents.

"The Price Commission has determined that the quality of a product is a part of its price and that a reduction in quality is a reduction (sic) [an increase] in price. Rent is simply the price one pays for the right to inhabit a residence i. e., a lease. A part of the 'quality' of a lease is its duration. A reduction in the duration of a lease from that previously granted is, in the opinion of the Rent Advisory Board, an increase in rent. Regulation of duration is incidental to regulation of amount. It is the opinion of the Board that if § 301.208, [the 8 percent rule] explicitly or impliedly, regulates duration, it is a reasonable regulation designed to achieve the goals of the Act and in (sic) [is] neither arbitrary nor capricious in application or effect." [6]

Plaintiffs refer the Court to the Amalgamated Meat Cutters case in support of their position that "regulations must be authorized by and in furtherance of the statute". In that opinion, upholding the constitutionality of the Economic Stabilization Act of 1970, the court considered the scope of authority delegated and stated "In other contexts when agencies have been given enormous regulatory tasks, the courts have interpreted the underlying statutes to take account of what is feasible". (p. 758) The Supreme Court has considered the question of statutory authority in In Re Permian Basin Area Rate Cases, 390 U. S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968):

"This Court has repeatedly held that the width of administrative authority must be measured in part by the purposes for which it was conferred; * * * We cannot . . . conclude that Congress has given authority inadequate to achieve with reasonable effectiveness the purposes for which it has acted." (pp. 776, 777, 88 S.Ct. p. 1364)

See also, United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); Foster & Co. v. Bowles, 144 F.2d 870 (Em.App.1944).

■ A legislative intent to give the President and his delegatees broad discretion to do what is necessary to stabilize prices, rents, wages, salaries, dividends and interest rates is apparent in Sections 202 and 203 of the Act as amended. These sections read, in pertinent part as follows:

"§ 202.    Findings

"It is hereby determined that in order to stabilize the economy, reduce inflation, minimize unemployment, improve the Nation's competitive position in world trade, and protect the purchasing power of the dollar, it is necessary to stabilize prices, rents, wages, salaries, dividends, and interest. The adjustments necessary to carry out this program require prompt judgments and actions by the executive branch of the Government. The President is in a position to implement promptly and effectively the program authorized by this title.

"§ 203.    Presidential authority

"(a) The President is authorized to issue such orders and regulations as he deems appropriate, accompanied by

5. Defendant's Supplement to Memorandum of Law at 4.

6. Affidavit of James R. Tanch, Executive Secretary of the Rent Advisory Board of the Price Commission, at 7.

a statement of reasons for such orders and regulations, to—

"(1) stabilize prices, rents, wages, and salaries at levels not less than those prevailing on May 25, 1970, except that prices may be stabilized at levels below those prevailing on such date if it is necessary to carry out the purposes of this title; and

"(2) stabilize interest rates and corporate dividends and similar transfers at levels consistent with orderly economic growth.

Such orders and regulations shall provide for the making of such adjustments as may be necessary to prevent gross inequities, and shall be consistent with the standards issued pursuant to subsection (b).

"(b) In carrying out the authority vested in him by subsection (a), the President shall issue standards to serve as a guide for determining levels of wages, salaries, prices, rents, interest rates, corporate dividends, and similar transfers which are consistent with the purposes of this title and orderly economic growth. Such standards shall—

"(1) be generally fair and equitable;

"(2) provide for the making of such general exceptions and variations as are necessary to foster orderly economic growth and to prevent gross inequities, hardships, serious market disruptions, domestic shortages of raw materials, localized shortages of labor, and windfall profits;

"(3) take into account changes in productivity and the cost of living, as well as such other factors consistent with the purposes of this title as are appropriate;

"(4) provide for the requiring of appropriate reductions in prices and rents whenever warranted after consideration of lower costs, labor shortages, and other pertinent factors; and

"(5) call for generally comparable sacrifices by business and labor as well as other segments of the economy."

■ With respect to prices and rents, the Price Commission is authorized to act within the broad scope of authority delegated by Congress to the President. The Commission is responsible to establish standards and implementation procedures designed to stabilize prices and rents.[7] In order to prevent the stabilization program from producing increased inflation and windfall profits, the Commission obviously must adopt different rules to regulate different sources of inflation. It recognized that landlords who rent for periods greater than one year (normally 2 or 3 years) engage in prospective pricing, while those who rent for terms of one year and less engage in retrospective pricing. The Commission allows a fair and equitable base rent adjustment of up to 7.99 percent on residences with leases of greater than one year's duration entered into before May 15, 1971. It has determined that increases of 8 percent or more are unjustified and inflationary. Surely the Commission could have adopted a rigid 8 percent ceiling. Instead, the Commission promulgated the "8 percent rule" which provides a flexible ceiling and involves less interference with traditional leasing practices. This regulation affords the landlord an opportunity to request a higher base rent adjustment if he is willing to continue his traditional practice of offering long leases.[8] While the immediate impact

7. Cost of Living Council Order No. 4, Delegation of Authority Concerning Stabilization of Prices and Rents, 36 F.R. 20202.

8. The Commission indicates that the actual base rent adjustment will generally still not be as high as permitted under the "average transaction formula" because the tenant's option to take an 8 percent increase on a yearly basis gives the tenant some bargaining power.

of an increase of 8 percent or more is inflationary, even under a long lease, the Commission's expert opinion is that the continued practice of long term leasing will have a stabilizing effect on the economy. In the Court's view, the flexible ceiling provided in the "8 percent rule" accomplishes, with reasonable effectiveness, the Congressional mandate to stabilize rents. Congress, in delegating broad authority in order to stabilize the economy, certainly was aware of the need for flexibility in regulating infinitely variable economic conditions. In light of the broad delegation of legislative authority to the Commission to do what is appropriate to stabilize rents, this Court cannot conclude that it has exceeded that authority in promulgating the "8 percent rule". United States v. J. B. Montgomery, Inc.,[9] and Neel v. United States,[10] relied on by plaintiffs are not persuasive. The regulations challenged in those cases were clearly in conflict with the legislative intent.

◼ Plaintiffs' second contention is that the "8 percent rule" exceeds the authority of the Commission because it is an unauthorized interference with the constitutionally protected right to contract. This contention is without merit. Private contracts cannot defeat legitimate government authority. In Foster & Co. v. Bowles, 144 F.2d 870 (Emer.Ct. App.1943), cert. denied 320 U.S. 787, 64 Price Administration was challenged for exceeding the authority of the agency. The court held the agency had authority to promulgate the regulation and then stated, "The necessity arose to change the Regulation in order to bring about effective price control and complainant's contracts must yield to this necessity". (P. 873). See also, Legal Tender Cases, 12 Wall. 457, 79 U.S. 457, 20 L.Ed. 287 (1872); California Teachers Ass'n v. Newport Mesa Unified School District, 333 F.Supp. 436 (C.D.Cal.1971); Amal-

gamated Meat Cutters & Butcher Workmen of North America v. Connally, 337 F.Supp. 737 (D.D.C.1971); Taylor v. Brown, 137 F.2d 654, 659 (Emer.Ct. App.1943), cert. denied 320 U.S. 787, 64 S.Ct. 194, 88 L.Ed. 473.

◼ Plaintiffs' third contention is that the "8 percent rule" exceeds the authority of the Commission because the duration of some leases may extend beyond the termination date of the Act due to options required by the regulation. This contention is also without merit. The challenged rule is a valid regulation designed to determine "base rents". The regulation affords plaintiffs a reasonable choice. If they request a rent increase of 7.99% or less the regulation is inapplicable, but if plaintiffs elect to bring themselves within the provisions of the regulation by demanding an increase of 8 percent or more they may have to write a lease which runs beyond the termination date of the Act. Although the regulation itself is, of course, invalid beyond the termination date of the Act, it may have effects long beyond that date.

◼ Lastly, plaintiffs argue that the challenged regulation discriminates against them in violation of due process. It is true that the challenged regulation only applies to landlords who had leased their premises for a term of more than one year prior to May 15, 1971. As mentioned earlier, however, the Commission recognized that a different inflationary effect is caused by the prospective pricing practices engaged in by landlords who rent their residences for periods greater than one year. Its decision to regulate this segment of the market in a different manner is clearly reasonable. The Temporary Emergency Court of Appeals has already spoken on the standards to be applied by the Court in determining whether regulations issued by the Price Commission are un-

9. 206 F.Supp. 455 (D.Colo.1962) aff'd 376 U.S. 389, 84 S.Ct. 884, 11 L.Ed.2d 797, rehearing denied, 377 U.S. 925, 84 S.Ct. 1218, 12 L.Ed.2d 217 (1964).

10. 266 F.Supp. 7 (N.D.Ga.1966).

lawfully discriminatory. The Court stated:

"The Supreme Court, in Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971), holds that federal statutes are consistent with the due process clause of the Fifth Amendment if they meet the rational basis test enunciated in Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), as follows:

'In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." . . . "The problems of government are practical ones and may justify, if they do not require, rough accommodations —illogical, it may be, and unscientific." . . . "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." '

"It is apparent that a reasonable basis exists for the orders and actions of the Executive branch here attacked." [11]

See also, Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); Huber Investment Corp. v. Connally, 337 F.Supp. 507 (S.D.Ohio 1972); California Teachers Ass'n v. Newport Mesa Unified School District, 333 F.Supp. 436 (C.D.Cal.1971).

Section 211(c) of the Economic Stabilization Act Amendments of 1971 provides "In any action commenced under this title in any district court of the United States in which the court determines that a substantial constitutional issue exists, the court shall certify such issue to the Temporary Emergency Court of Appeals". This procedure for resolution of constitutional issues is similar to the procedure set forth in 28 U.S.C. § 2282. In California Water Service v. City of Redding, 304 U.S. 252, 58 S.Ct. 865, 82 L.Ed. 1323 (1938), the Supreme Court stated "The lack of substantiality in a federal question may appear either because it is obviously without merit or because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject." See also, Local Union No. 300, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO v. McCulloch, 428 F.2d 396 (C.A.5 1970); Utica Mutual Ins. Co. v. Vincent, 375 F.2d 129 (2d Cir. 1967), cert. denied 389 U.S. 839, 88 S.Ct. 63, 19 L.Ed.2d 102. In the present action this Court has determined that the plaintiffs' constitutional challenge is "obviously without merit".

Judgment will be entered in favor of defendants.

## APPENDIX

"§ 301.208—RESIDENCES WITH LEASES OF GREATER THAN 1 YEAR'S DURATION ENTERED INTO BEFORE MAY 15, 1971.

(a) *Applicability.* Notwithstanding any other provision of this subpart, the base rent (except for the base rent of any unit covered by § 301.105 and § 301.205) of the following residences shall be determined as provided in this section:

(1) Those upon which a lease of greater than 1 year was entered into before May 15, 1971, and which expired after December 28, 1971 (whether or not a lease was entered into with respect to that residence after December 28, 1971).

(2) Those upon which a lease of greater than 1 year was entered into before May 15, 1971, and which expired during the period beginning on August 15, 1971, and ending on December 28, 1971, and with respect to which a lease of lesser duration than

---

11. United States v. Lieb, 462 F.2d 1161 (Em.App.1972).

the expired lease was entered into after December 28, 1971.

This section does not apply in any case in which the monthly rent charged by the lessor, or otherwise authorized under this part, excluding any increases for real estate taxes, allowable municipal service charges, capital improvements began before June 1, 1972, and increases in property or service, is (or will be in the case of any lease entered into after July 1, 1972) less than 8 percent greater than the rent charged for the most recent rent payment interval before May 15, 1971. After a lessor has complied with this section with respect to a particular residence, and the base rent of that residence has been determined under this section, the amount of subsequent rent adjustments for that residence shall be determined as otherwise provided in this part.

(b) *Determination of base rent.* In any case in which a lessor offers to lease, or is leasing, a residence to which this section applies, he shall offer the following options to the current lessee or a new lessee, as the case may be:

(1) A lease of equal or greater duration than the expiring lease referred to in subparagraph (1) or (2) of paragraph (a) of this section which provides for a monthly rent not to exceed that allowable by the application of Subparts B and C of this part.

(2) As specified by the lessee, a lease of 1 year or a lease for a period equal to the unexpired portion of the lease entered into by the lessor and lessee before July 1, 1972, if that portion is less than 1 year, providing for a monthly rent which, including the amount of the increase resulting from the application of § 301.206, the allowable rent increase provided by § 301.101(a)(1), and any increase for capital improvements (began after May 31, 1972) under § 301.101(a)(3), but excluding allowable cost increases provided by § 301.101(a)(2) and increases in property or services under § 301.101(a)(4), does not exceed the

monthly rent charged for the most recent rent payment interval before May 15, 1971, plus 8 percent. If the lessee elects the option provided by subparagraph (1) of this paragraph, the base rent of the residence shall be the base rent determined under Subpart C of this part. If the lessee elects the option provided by subparagraph (2) of this paragraph, the base rent shall be the rent specified in the lease offered under that subparagraph, less any increases provided by § 301.101(a).

(c) *Effective date of options.*

(1) New lessees. The term of the lease offered to a new lessee under paragraph (b) of this section shall begin on the date the lessee acquires possession. The rent specified in that lease shall be effective beginning with the first rent payment interval of the lease.

(2) Current lessees. The term of the lease offered to a current lessee (a lessee with a present right of possession of the residence) under paragraph (b)(1) of this section shall begin on the date specified by the lessor. The term of the lease offered to a current lessee under paragraph (b)(2) of this section shall begin on July 1, 1972, if that lessee had entered into a lease on the residence between December 29, 1971, and July 1, 1972. If the current lessee had not entered into a lease on the residence during that period, the term of the lease offered under paragraph (b)(2) of this section shall begin on the date the current lease expires. The rent specified in the lease offered to a current lessee under either of those subparagraphs shall become effective for the first rent payment interval of the lease after June 30, 1972.

(d) *Notification.* Before a lease is entered into under this section, the lessor shall notify the lessee of the lessee's options on Form S–70 which is available at local Internal Revenue Service Offices. Each lessor of a lease to which this section applies who has entered into

a lease with a current lessee between December 29, 1971 and July 1, 1972, inclusive shall, before September 1, 1972, notify that lessee of the options available to him under this section.

Section 301.208 was amended effective September 20, 1972 to provide that increases due ·to capital improvements, whether begun before or after May 31, 1972, are not required to be included in computing the 8 percent ceiling. See Federal Register, Vol. 37, No. 184.