**CITIES SERVICE COMPANY and Cities Service Oil Company, Plaintiffs-Appellants,**

**Gulf Oil Corporation et al., Amici Curiae,**

v.

**FEDERAL ENERGY ADMINISTRATION and Frank G. Zarb, Defendants-Appellees,**

**and**

**Ashland Oil, Inc., Amicus Curiae.**

**No. DC–34.**

Temporary Emergency Court of Appeals.

Dec. 31, 1975.

---

Paul A. Lenzini, with whom Lawrence I. Abrams and Carl W. Ulrich, Chapman, Duff & Lenzini, Washington, D. C., and Charles V. Wheeler and Jack W. Wertz, Cities Service Oil Co., Tulsa, Okl., were on the brief for plaintiffs-appellants.

Jesse P. Luton, Jr., with whom Catherine C. McCulley, Gulf Oil Corp., Houston, Tex., were on the brief as amicus curiae Gulf Oil Corp.

William H. Allen, with whom John A. Hodges, Covington & Burling, Washington, D. C., and Robert L. Norris, Jr., Exxon Corp., Houston, Tex., were on the brief as amicus curiae Exxon Corp.

George Blow, with whom John Oberdorfer and Gail F. Borden, Patton, Boggs & Blow, Washington, D. C., and Kent B. Hampton, Marathon Oil Co., Findlay, Ohio, and Ralph S. Spritzer, Philadelphia, Pa., of counsel, were on the brief as amicus curiae Marathon Oil Co.

Ray B. Williamson, Shank, Irwin, Conant, Williamson & Grevelle, Dallas, Tex., on the brief as amicus curiae Hunt Oil Co.

Patricia N. Blair, Dept. of Justice, with whom Rex E. Lee, Asst. Atty. Gen., and Stanley D. Rose, Washington, D. C., were on the brief for defendants-appellees.

David Ginsburg, with whom Fred W. Drogula and Peter H. Rodgers, Ginsburg, Feldman & Bress, Washington, D.

C., and Arloe W. Mayne, Ashland, Ky., of counsel, Ashland Oil, Inc., were on the brief for amicus curiae Ashland Oil, Inc.

Before CHRISTENSEN, ESTES and JOHNSON, Judges.

ESTES, Judge.

This suit was commenced in the United States District Court for the District of Columbia by Cities Service Company and its wholly-owned subsidiary Cities Service Oil Company (Cities Service), plaintiffs-appellants, to obtain injunctive relief from all or part of their purchase obligations under the Old Oil Entitlements Program,[1] 10 CFR § 211.67 (Entitlements Program), 39 FR 42,246 (Dec. 4, 1974), and a declaratory judgment that the actions of the Federal Energy Administration,[2] et al. (FEA), defendants-appellees, in promulgating the Entitlements Program were unlawful on the grounds that such actions were: in excess of the agency's statutory authority; arbitrary, capricious, and an abuse of discretion; not in accordance with the governing statute; and an unconstitutional burden on the plaintiffs.[3]

Cities Service based these contentions on its allegations that the program fails

to physically allocate any crude oil or set the prices for such oil; that Cities Service is unable to pass through its increased costs under the program on a dollar-for-dollar basis as mandated by section 4(b)(2)(A) of the Emergency Petroleum Allocation Act of 1973, 87 Stat. 628, as amended, 15 U.S.C. § 753(b)(2)(A) (1975 Supp.); that the classification of buyers and sellers under the program lacks a rational basis; the program causes further market distortions; that the small refiner bias is arbitrary and capricious; that under the program Cities Service is required to make cash payments to its refiner-competitors which is not mandated by the Allocation Act and constitutes an unconstitutional taking of property for private purposes without just compensation prohibited by the Fifth Amendment, and that the program is an unconstitutional tax prohibited by Article I, Sec. 8, cl. 1 of the Constitution.

■ On July 10, 1975, the district court consolidated the hearing on plaintiffs' motion for a preliminary injunction with a plenary hearing on the merits; denied the plaintiffs injunctive relief; refused to certify plaintiffs' constitutional claims, finding them insubstantial and without merit;[4] and entered judgment

---

1. Cities Service sought to enjoin the imposition or enforcement of any entitlement purchase obligations based on its refining more old oil than the national average or, in the alternative, to enjoin the imposition or enforcement of any entitlement purchase obligations based on its refining its own old oil production.

2. Congress established the Federal Energy Administration under the Federal Energy Administration Act of 1974, 88 Stat. 97, 15 U.S.C. § 761 et seq. (1975 Supp.), "to assure a coordinated and effective approach to overcoming energy shortages . . .." 15 U.S.C. § 761(b).

3. Pursuant to 10 CFR § 205 Subpart D, Cities Service filed an application with the Office of Exceptions and Appeals of the FEA for exception relief from the Entitlements program for purchase obligations arising out of the crude oil runs to stills made by Cities Service in November. *Cities Service Company,* Case No. FEE 1443 (filed 2–7–75, decided 2–20–75), 3 CCH Energy Management ¶ 83,043. Subsequently, Cities Service filed an application for complete exception relief from the Entitle-

ments program for the duration of the regulations' existence. *Cities Service Company,* Case No. FEE 1459 (filed 2–13–75, decided 3–27–75), 3 CCH Energy Management ¶ 83,100. Both applications for relief were denied by the FEA. Under 10 CFR § 205.58 and § 205.-100(b), a party aggrieved by an order issued by the FEA under, *inter alia,* 10 CFR § 205 subpart D, has not exhausted its administrative remedies until an appeal has been filed pursuant to 10 CFR § 205, Subpart H, and an order granting or denying the appeal has been issued. Cities Service filed an appeal from the February 20, 1975 decision of the FEA, which was also denied. *Cities Service Company,* Case No. FEA 0385 (filed 3–24–75, decided 4–8–75), 3 CCH Energy Management ¶ 80,568.

4. Under section 211(c) of the Economic Stabilization Act of 1970, 84 Stat. 799, as amended (Stabilization Act), 12 U.S.C. § 1904 note (1975 Supp.), as incorporated into the Allocation Act by section 5(a)(1) thereof, 15 U.S.C. § 754(a)(1) (1975 Supp.), in any action where the district court determines that a substantial constitutional issue exists, the court must certify such issue for resolution by the Temporary

for the defendants. *Cities Service Company et al. v. F.E.A. et al.* (D.D.C. CA No. 75–653, July 10, 1975), 3 CCH Energy Management ¶ 26,024. Most of plaintiffs' contentions were rejected by the district court for the reasons three district courts had held that FEA's Entitlements program was authorized by the governing statute and the constitutional questions presented were without merit. *Exxon Oil Company v. F.E.A.* (D.N.J. CA No. 75–150, Jan. 30, 1975), dismissed for lack of jurisdiction, 516 F.2d 1397 (Em.App.1975), 3 CCH Energy Management ¶ 26,019; *Marathon Oil Co. v. F.E.A.* (N.D.Ohio CA No. 75–36, Jan. 31, 1975), 3 CCH Energy Management ¶ 26,015, dismissed for lack of jurisdiction, 516 F.2d 1397 (Em.App.1975), 3 CCH Energy Management ¶ 26,019; *Gulf Oil Corporation v. F.E.A.*, 391 F.Supp. 856 (W.D.Pa.1975), 3 CCH Energy Management ¶ 26,014, dismissed for lack of jurisdiction, 521 F.2d 810 (Em.App.1975). Notice of appeal was filed in this court by Cities Service on July 18, 1975.

Exxon, Marathon, and Gulf, respectively, have filed briefs in support of Cities Service's position.

Cities Service is an integrated petroleum company engaged in producing, transporting, refining, purchasing, and selling crude oil and petroleum products. A high proportion of the crude oil Cities Service refines is its own "old" oil production, i. e., crude oil the price of which is controlled by the FEA at approximately $5.25 under the two-tier price system, 10 CFR § 212.73.[5] The two-tier price system was upheld by this court in a comprehensive opinion discussing the validity and effects of the system in *Consumers Union v. Sawhill*, 525 F.2d 1068, rehearing *en banc* (1975), 3 CCH Energy Management ¶ 26,011, vacating 512 F.2d 1112 (Em.App.1975).

The two-tier price system effectively minimized the inflationary impact of rising world-wide oil prices and provided necessary incentives for increased domestic production. However, with the end of the Arab oil embargo and emergence of adequate crude oil supplies, the in-put cost of crude oil to refiners assumed crucial significance. Consumers could buy gasoline from stations with the lowest prices, rather than from stations with the shortest waiting lines. Thus, the great disparity between the price of controlled and uncontrolled crude oil was having an unequal impact on all refiners[6] and, contrary to other objectives of the Allocation Act, contained in section 4(b)(1)(A)–(I), economic distortions, interference with the competitive viability of the small and independent sectors of the petroleum industry, and inequitable prices to consumers devel-

Emergency Court of Appeals. As the district court stated, citing *Delaware Valley Apartment House Owners' Ass'n v. U. S.*, 350 F.Supp. 1144 (E.D.Pa.1972), *aff'd*, 482 F.2d 1400 (Em.App.1973): "[s]uch [constitutional] questions are not substantial if they are plainly without merit or if previous Supreme Court decisions appear to foreclose the subject." 3 CCH Energy Management ¶ 26,024 at p. 26,-224.

5. The Cost of Living Council originated the "two-tier" pricing system for crude oil as a part of Phase IV of the Stabilization Program. 6 C.F.R. § 150, Subpart L, 38 F.R. 22,536 (Aug. 22, 1973). These rules were subsequently adopted by the Federal Energy Office as 10 CFR § 212, Subpart D, 39 F.R. 1924 (Jan. 15, 1974). The Federal Energy Office became the Federal Energy Administration on June 27, 1974, pursuant to the Federal Energy Administration Act of 1974, Pub.L. 93–275, 88 Stat. 97, 15 U.S.C. § 761 et seq. (1975 Supp.).

6. As this court stated in *Pasco, Inc. v. F.E.A.*, 525 F.2d 1391 at p. 1395 (Em.App.1975), 3 CCH Energy Management ¶ 26,031 at p. 26,-252, "During the base period of May, 1973, composite crude oil costs of all refiners were approximately equal; however, with the pricing system in effect, the major integrated oil companies, who as a class had far greater access to old oil, had significantly lower composite crude oil costs in refining their products than did the small and independent refiners." Prior to the advent of the two-tier price system, Cities Service had higher weighted average crude oil costs than the weighted average cost for all major refiners; however, the circumstances necessitating implementation of the two-tier system and passage of the Allocation Act resulted in the composite crude oil costs of Cities Service falling below that of other majors and the small and independent refiners.

oped in certain areas of the country under the two-tier system due to the varying reliance of the geographic region in which they made gasoline and petroleum product purchases on uncontrolled domestic and imported oil.

■ Seeking to remedy this situation without losing the beneficial aspects of the two-tier price system, the FEA promulgated the Entitlements Program.[7] The basic purpose of the Entitlements Program was to spread the benefit of access to old price-controlled oil and the burden of dependence on uncontrolled oil among all sectors of the petroleum industry, all regions of the country, and among all consumers of petroleum products,[8] while retaining the incentives for increased production and anti-inflationary measures which the two-tier price system provided.

The Entitlements Program essentially requires petroleum refiners to shift their over-all reliance on controlled or uncontrolled oil to a more balanced position among all the refiners. A refiner must, under the Entitlements Program, have one entitlement for each barrel of old oil which it refines during any month. The FEA issues a certain number of entitlements to each refiner each month, based on that refiner's proportionate share of all old oil refined on a nation-wide basis, adjusted somewhat by the small refiner bias.[9] The program thus commenced on the premise that all refiners should be including an equal proportionate share of price-controlled oil in their refinery runs each month.

Entitlement purchase obligations are imposed on a refinery when, on the basis of information supplied to the FEA, it has been determined that the refiner was running more old oil as a percentage of its total crude oil refinery runs than the national average and consequently does not have sufficient entitlements for all of the old oil it has refined during that month. Those refiners with less old oil in their refinery runs than the national average would receive more entitlements than necessary for compliance, which they may sell to those refiners which have purchase obligations under the regulations. Thus,

[b]y requiring refiners and importers who sell entitlements to reduce their crude oil or product costs by the amount of the entitlement sales proceeds, and allowing a purchaser of entitlements to include the cost of entitlements in its crude oil costs, the FEA basically equalized the average weighted crude oil costs of all refiners, thereby eliminating the inequities caused by the 'two-tier' pricing system.

*Pasco, Inc. v. F.E.A.,* 525 F.2d 1391 at p. 1395 (Em.App.1975), 3 CCH Energy Management ¶ 26,031 at p. 26,252, rev'g (D.Wy.Dkt. No. C75–91, Aug. 27, 1975), 3 CCH Energy Management ¶ 26,025.

Cities Service contends on this appeal that the Entitlements Program is not authorized by the Allocation Act and is not within the FEA's authority to allocate and specify prices for crude oil, residual fuel oil and refined petroleum products. This contention is based upon Cities Service's misinterpretation of Section

7. The Entitlements Program originated in a notice of proposed rulemaking issued by the FEA on August 28, 1974, 39 F.R. 31,650 (Aug. 30, 1974), following which public hearings were held and over 600 comments were received by the FEA. A second notice of proposed rulemaking was issued by the FEA on November 7, 1974, 39 F.R. 39,740 (Nov. 11, 1974), following which the FEA received over 175 comments on the proposed rule. On November 29, 1974, the FEA issued the Entitlements regulation in its final form. 39 F.R. 42,246 (Dec. 4, 1974).

8. This court has previously stated with regard to a small refiner that: "Pasco, a profitable

producer-refiner, operating in the petroleum industry, must accept its fair and equitable share of the burdens as well as the benefits of the programs implementing the Allocation Act which the national energy crisis necessitated." *Pasco, Inc. v. F.E.A.,* 525 F.2d 1391 at p. 1400 (Em.App.1975), 3 CCH Energy Management ¶ 26,031 at p. 26,256.

9. The small refiner bias provides additional entitlements to small refiners in an amount based on a designated percentage of each small refiner's average daily volume of crude oil runs to stills. 39 F.R. 42,246 (Dec. 4, 1974).

4(a) of the Allocation Act and a disregard of the objectives, set forth by Congress in Section 4(b), which the regulations promulgated under Section 4(a) are to achieve "to the maximum extent practicable." Cities Service contends that the objectives of Section 4(b) set forth goals to be accomplished by regulations promulgated under the Allocation Act, but that those goals do not delegate any power or authority to the FEA independent of that authority contained in Section 4(a). It asserts that statutory goals such as "protection of public health, safety and welfare . . . and the national defense" are too broad to constitute a grant of any authority independent of Section 4(a).

■ A proper interpretation of the Allocation Act and its provisions requires recognition of the fact that the authority under Section 4(a) must be read together with the objectives which the exercise of that authority is to obtain. As stated by the Supreme Court in *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962): "We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act . . .." In *Mastro Plastics Corporation v. National Labor Relations Board,* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956), the Supreme Court, in interpreting Section 8(d) of the National Labor Relations Act, as amended, rejected "a narrowly literal construction" of the statute and stated:

If the above words are read in complete isolation from their context in the Act, such an interpretation is possible. However, "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States v. Boisdore's Heirs* (U.S.), 8 How. 113, 122, 12 L.Ed. 1009.

350 U.S. at 285, 76 S.Ct. at 359, 100 L.Ed. at 321. *N.L.R.B. v. Lion Oil Co.,* 352 U.S. 282, 288, 77 S.Ct. 330, 1 L.Ed.2d 331, 337 (1957); *Allied Chem. & Alkali Wkrs. v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 185, 92 S.Ct. 383, 400, 30 L.Ed.2d 341 (1971); *Golden State Bottling Co., Inc. v. N.L.R.B.,* 414 U.S. 168, 177, 94 S.Ct. 414, 421, 38 L.Ed.2d 388 (1973).

In a recent decision of the Supreme Court, it has reaffirmed these principles of statutory construction in holding that the language and meaning of Section 7602 of the Internal Revenue Code of 1954 [which authorizes the Internal Revenue Service (IRS) to issue summons to further its tax investigations] had to be interpreted in a manner consistent with the authority to conduct broad investigatory inquiries conferred on the IRS under Section 7601, in order to avoid frustrating the purpose of those inquiries. *United States v. Bisceglia,* 420 U.S. 141, 150, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975).

In the Joint Explanatory Statement of the Committee of Conference on the Allocation Act, Conference Report 93–628, 2 U.S.Code Cong. & Ad.News, 93d Cong., 1st Sess., pp. 2688, 2689, the Committee stated: "The President is intended to have full flexibility in devising the most effective and efficient means of meeting the priority needs of the American people identified in section 4(b)." Thus, the allocation and pricing authority of Section 4(a) are without vitality unless and until the FEA exercises such authority in a manner which, to the extent practicable, gives effect to the objectives of Section 4(b).

■ Neither was the allocation authority considered by Congress as being separate and apart from the pricing authority conferred on the FEA. The Conference Report states: "The conference committee has decided to couple price controls with the mandatory allocation authority so as to focus in a single act decision-making authority and responsibility for dealing with the fuels shortage situation. . . . Congress intends to force the Administration to rationalize and harmonize the objective of equitable allocation of fuels with the objectives of the Economic Stabilization Act." Conference Report 93–628, *supra,* 2 U.S.Code Cong. & Ad.News, 93d Cong., 1st Sess., pp. 2688, 2702. Therefore, plaintiff's in-

sistence upon the bifurcation of the authority conferred on the FEA under Section 4(a) from the objectives of 4(b), in their endeavor to assert the lack of specific authority under the Allocation Act for the Entitlements Program, is unwarranted and unreasonable. The Entitlements Program is clearly within the authority conferred on the FEA under the Allocation Act.[10]

Cities Service further contends on this appeal that the Entitlements Program, 10 CFR § 211.67, as promulgated by the FEA, violates Section 4(b)(2)(A) of the Allocation Act by failing to provide Cities Service with an effective means of passing through its costs resulting from the Entitlements Program on a dollar-for-dollar basis. The Allocation Act, under Section 4(b)(2)(A) mandates that the

FEA, in promulgating its regulations, provide a dollar-for-dollar pass-through of net increases in the cost of crude oil. The FEA has responded to this mandate through 10 CFR § 212.83(c)(2). Under this regulation the cost of entitlement purchases and the revenues from entitlement sales must be added to or deducted from the cost of crude oil purchased or landed in that month, for the purposes of calculating the increased cost to be applied to product prices for the following month under the "A +" factor of Section 212.83(c)(2), which is the general product pricing formula.

■ Cities Service argues that because it has certain banked costs which it was unable to pass through in earlier months prior to the promulgation of the Entitlements Program, it cannot now

---

**10.** While it is not necessary to go further in finding authority for the Entitlements Program, we note that in *Pasco, Inc. v. F.E.A.,* *supra*, 525 F.2d at p. 1401, n. 21, 3 CCH Energy Management at p. 26,258, n. 21, this court stated that: "[t]he Committee Reports of the Senate and House are quite enlightening on the FEA's authority to promulgate the Entitlements program." During its consideration of the first extension of the Allocation Act, a Senate Committee stated that the Allocation Act

provides ample authority for the F.E.A. to institute a system of price equalization to provide that all segments of the industry benefit from lower-priced domestic oil. The Committee was urged to amend the Act to achieve this objective but has been assured that F.E.A. intends to institute a price equalization program under existing authority in the immediate future.

S.Rep.No.93–1082, Comm. on Interior and Insular Affairs, 93d Cong., 2d Sess. at 2 (Aug. 9, 1974).

Further, a House Committee Report, issued two months later, clearly indicates the FEA's authority

to institute a system of price equalization applicable to crude oil, residual fuel oil and refined products to eliminate the regional and competitive inequities which result from a dependence upon high-cost imported oils and petroleum products. The F.E.A.'s stated commitment to Subcommittee Chairman Macdonald during the hearings on this bill to move promptly on a price equalization program has convinced the Committee that specific amendments to the Act to compel such action may prove to be unnecessary.

H.Rep.No.93–1443, 93d Cong., 2d Sess. at 3 (Oct. 8, 1974).

Cities Service contends that such legislative reports are "subsequent legislative history" such as are proscribed by the Supreme Court in Regional Rail Reorganization Act Cases (*Blanchette v. Connecticut General Insurance Corporation*) 419 U.S. 102, 132, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). The Court there stated, "post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage." However, in this case the Allocation Act was directly before Congress by reason of the expiration of the Act and the necessity of extending its provisions as Congress saw fit. Therefore, the above reports are contemporaneous with the Act's extension and, further, the remarks are not being used to indicate any different legislative intent, but rather that intent expressly found by a contemporaneous construction of the Act by the agency charged with administering it.

Courts give great deference to the construction of an Act by the agency charged with administering it, and hence where Congressional intent congruous therewith is found to have been expressed not subsequent to the Act's passage but contemporaneously with the Act's renewal, its pertinence to the court's task in adjudging the agency's exercise of authority under the Act is clear. *See,* generally, *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Pacific Coast Meat Job. Ass'n, Inc. v. Cost of Living Coun.,* 481 F.2d 1388 (Em.App.1973); *University of Southern California v. Cost of Living Coun.,* 472 F.2d 1065 (Em.App.1972).

pass through its entitlements costs due to the current passing through by Cities Service of these former banked costs. The FEA pass-through regulation provides for the pass-through of costs other than those derived from the Entitlements Program.[11] However, Cities Service has, during the first four months of 1975, passed through under this regulation costs totaling more than their $23.9 million of entitlement purchases incurred over the same period of time.[12] Whether or not the increased costs which Cities Service passed through were banked costs or entitlement costs, the FEA pass-through regulation is clearly effective for the purpose for which it was promulgated.[13] Whether or not Cities Service passes through its entitlement costs in the month following their purchase, or in a much later month, depends on business judgments which Cities Service must make. The Allocation Act does not guarantee that all increased costs will be absorbed by the market place without any change in the market shares of the respective companies when they pass through such costs under section 4(b)(2)(A); rather, the Act merely mandates that an opportunity for the pass-through of such costs be provided. This the FEA has done, and this court holds that the Entitlements Program does not violate section 4(b)(2)(A) of the Allocation Act.

■ Cities Service further contends that the Entitlements Program is arbitrary and capricious and constitutes an abuse of administrative discretion on the part of the FEA, for the reasons that: the entitlements regulation fails to pro-

vide for a separation of those companies within the petroleum industry which are integrated companies from those which are not; the Entitlements Program impacted on the market in such a way as to require certain further market distortions by the FEA through its exception process; and the small refiner bias included within the entitlements regulation, 10 CFR § 211.67(e), is arbitrary and capricious. As stated in *Pasco, Inc., v. F.E.A., supra,* 525 F.2d at p. 1400, 3 CCH Energy Management ¶ 26,031 at p. 26,-256,

[i]n reviewing the discharge of an agency's function in interpreting the Act, promulgating regulations thereunder and applying and enforcing such regulations, this court has recognized that where administrative control has been congressionally authorized, the "judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." *Pacific Coast Meat Job. Ass'n, Inc. v. Cost of Living Coun.,* 481 F.2d 1388, 1391 (Em.App. 1973), which was quoting from *Miss. Valley Barge Co. v. United States,* 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260 (1934).

This court, in *Pasco,* found that the plaintiffs in that case had failed to establish that the Entitlements Program was arbitrary, capricious, or beyond the agency's authority due to its failure to make a differentiation within the regulation between refiners producing their own crude oil and those refiners purchas-

---

**11.** Under 10 CFR § 212.83, a refiner's increased product and non-product costs may be included to the extent provided in § 212.83, in the computation under § 212.82 of base prices and allowable prices in excess of the base prices for covered products.

**12.** See Finding of Fact Number 25, *Cities Service v. F.E.A.,* (D.D.C. CA No. 75–653, July 10, 1975), 3 CCH Energy Management ¶ 26,024 at p. 26,221.

**13.** The district court did not, as appellant erroneously contends, premise its finding that Cities Service had failed to show that it could

not recover its entitlement purchase costs from the market place on the conclusion that every dollar Cities Service recovered during the first four months of 1975 constituted a recovery of entitlement purchase costs. The district court found that during the first four months of 1975 Cities Service was passing its increased costs through under 10 CFR § 212.-83 and thus a mechanism was clearly available by which Cities Service could have passed through its entitlement purchase costs if it had chosen to do so.

ing their refining needs. In so holding, we stated:

> The regulation [10 C.F.R. § 211.67], by granting entitlements to those refiners with old oil ratios below the national ratio due to their own high production of new, released and stripper well oil, merely provides for the continuation of the monetary incentive which was a fundamental part of the "two-tier" pricing system. The correction of economic distortion and unfair competitive conditions occasioned by the "two-tier" system was considered essential by Congress and the FEA. . . . This court finds ample support for the entitlements regulation as promulgated by the FEA and, considering the urgent need for action, the implementing agency's program for achieving the varied objectives of the Allocation Act was certainly rational and neither arbitrary, capricious, nor beyond the authority of the agency.

*Pasco, Inc. v. F.E.A., supra,* 525 F.2d at p. 1402, 3 CCH Energy Management ¶ 26,031 at p. 26,258.

We therefore hold that the Entitlements regulation is a rational response to the changing conditions under which the objectives of section 4(b) must be read, and that the regulation is not arbitrary, capricious or an abuse of administrative discretion.

In accord with the decisions of three district courts which had previously faced the question of the constitutionality of the Entitlements Program, *Exxon Oil Company v. F.E.A., supra; Marathon Oil Co. v. F.E.A., supra,* and *Gulf Oil Corporation v. F.E.A., supra,* the district court in this case found that the contentions of Cities Service as to the unconstitutionality of the program did not present substantial constitutional questions requiring certification to this court. Cities Service contends on this appeal that the entitlement purchase obligations

imposed on it under 10 CFR § 211.67 are "a *prima facie* case of taking private property and direct bestowal upon another"; that Cities Service is being deprived of its secure access to domestic oil; that the entitlements regulation constitutes a taking without just compensation; and that it is an unconstitutional tax.

Claims for compensation from the government based upon the Fifth Amendment to the Constitution require a direct appropriation by the government of the claimant's property and do not encompass "consequential injuries resulting from the exercise of lawful power." *Knox v. Lee,* 12 Wall. 457, 79 U.S. 457, 551, 20 L.Ed. 287 (1870). In reviewing an order of the War Production Board which required the shut-down of non-essential gold mines due to the short supply of equipment and resources, the Supreme Court, in *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958), recognized that action under a regulation may so diminish the value of property as to constitute a taking, but stated: "[T]he mere fact that the regulation deprives the property owner of the most profitable use of his property is not necessarily enough to establish the owner's right to compensation." [14]

Cities Service and the *amici curiae* ardently contend that *Thompson v. Consolidated Gas Utilities Corp.,* 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510 (1937), "closely parallels" or "controls" this appeal and mandates a finding that the Entitlements Program is unconstitutional. For the reasons discussed below we reject this contention.

In *Thompson,* the Supreme Court held invalid a gas proration order issued by the Texas Railroad Commission which limited the production of sweet gas from the plaintiffs' wells to an amount below their production levels, transportation

---

**14.** This court has previously held, with regard to the Economic Stabilization Program, that the imposition of price ceilings on beef or the freezing of beef prices was not a "taking of their property without just compensation in violation of the due process clause of the fifth amendment." *Western States Meat Packers Ass'n Inc. v. Dunlop,* 482 F.2d 1401, 1403 (Em. App.1974).

and marketing capacities, and contractual market requirements. This order was issued December 10, 1935, pursuant to House Bill No. 266 (Acts of Texas 1935, c. 120, Vernon's Ann.Civ.Stats. Texas, art. 6008), which was enacted as "a comprehensive conservation statute."[15] *Consolidated Gas Utilities Corp. v. Thompson,* 14 F.Supp. 318, n. 3, 319–321 (W.D.Tex. 1936). The Supreme Court stated that the statute,

> construed as authorizing regulations to prevent waste, and to create and protect correlative rights of owners in a common reservoir of gas . . ., is a valid exercise of the State's undoubted power to legislate to those ends . . . . But, obviously, the proration orders would not be valid if shown to bear no reasonable relation either to the prevention of waste or the protection of correlative rights . . . .

300 U.S. 55, 69, 57 S.Ct. 364, 371, 81 L.Ed. 510. Finding that plaintiffs had amply demonstrated that their operations were free of waste and that continued operations would not be prejudicial to any public interest or private property rights, the Court concluded that the "sole purpose" of the orders limiting the plaintiffs' production was "to compel complainants to afford markets to those having none," 300 U.S. 55, 77–78, 57 S.Ct. 364, 375, 81 L.Ed. 510 and as such, the orders were invalid.

However, in *Railroad Com. v. Rowan & Nichols Oil Co.,* 310 U.S. 573, 60 S.Ct. 1021, 84 L.Ed. 1368 (1940), the Supreme Court upheld an oil proration order of the Texas Railroad Commission for the East Texas oil field against a Fourteenth Amendment attack that by virtue of allowances made to "marginal wells" (which would have had to be prematurely abandoned had the proration formula restricted their low productive capacity), "[t]he Commission's proration formula as applied permits other leaseholders, more leniently treated, to capture oil at a more rapid rate than is possible for the respondent, thereby draining away oil which underlies respondent's leased lands." 310 U.S. 577, 578, 60 S.Ct. 1021, 1023, 84 L.Ed. 1368. The individual interests of the small well operators and their effect on the state's economy, as well as the general problem of prorating the oil and gas production in the state, were considered by the Court to be within the province of the Commission.[16]

---

**15.** The Commission order in question indicated that because of the lack of any market demand for natural gas, "intolerable waste" was occurring and "by the fall of 1934, in excess of one billion cubic feet of gas was being blown into the air daily." *Consolidated Gas Utilities Corp. v. Thompson,* 14 F.Supp. 318, n. 3, pp. 319–321 (W.D.Tex.1936). The Supreme Court, quoting from special findings of the lower court, found adequate support for plaintiff's assertions that House Bill 266 was a conservation statute intended to prevent waste and that the plaintiffs were not committing any wasteful acts. The Court stated:

> "Before House Bill 266 went into effect, grossly wasteful practices in the production of natural gas in the Panhandle field were occurring," but "most of this waste was due to the extravagant production of natural gas from oil wells and to the production of gas from gas wells and processing such gas for the extraction of a very small quantity of natural gasoline therefrom and popping or wasting to the air the residue gas, which constituted 97% of the fuel value of the gas in its original state. . . . No evidence was offered—indeed, it was not even seriously claimed—that anything complainant had done or contemplated doing has, in the slightest degree, contributed or will contribute to that waste."

*Thompson v. Consolidated Gas Utilities Corp.,* 300 U.S. 55, 70, 57 S.Ct. 364, 371, 81 L.Ed. 510 (1937).

**16.** Referring to the complex "brood of litigation" challenging the administrative determinations which developed out of the states' attempts to adjust leasehold owners' interests with the "rule of capture," the Court, in *Railroad Com. v. Rowan & Nichols Oil Co.,* 310 U.S. 573, 580–584, 60 S.Ct. 1021, 1024, 84 L.Ed. 1368 (1940), stated:

> [S]uch cases are only episodes in the evolution of adjustment among private interests and in the reconciliation of all these private interests with the underlying public interest in such a vital source of energy for our day as oil. Certainly so far as the federal courts are concerned the evolution of these formulas belongs to the Commission and not to the judiciary. A controversy like this al-

The Court particularly noted, at 310 U.S. 577, 583 n. 1, 60 S.Ct. 1021, 1025, 84 L.Ed. 1368, that:

> We are here not concerned with a statute, or orders under it, not thought to enforce state policy "for the prevention of waste, and the protection of correlative rights of owners in the common pool," but directed solely "to compel those who may legally produce, because they have market outlets for permitted uses, to purchase gas from potential producers whom the statute prohibits from producing because they lack such a market for their possible product." Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 69, 77, 57 S.Ct. 364, 370, 371, 374, 81 L.Ed. 510 [517, 522]. [Emphasis added]

The differences between the circumstances and principles considered and discussed in Thompson and the relevant considerations before us now are abundantly clear. Grossly excessive production in the East Texas oil fields twice drove the price of East Texas oil down to ten cents or less per barrel during the early 1930's.[17] In Cities Service Gas Co. v. Peerless Oil & Gas Co., 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190 (1950), the Supreme Court upheld orders of the Oklahoma Corporation Commission which required Cities Service to make a connection with, and take natural gas ratably from, a Peerless Oil & Gas Company well at a price no less than seven cents per thousand cubic feet. Finding the minimum price-fixing order lawful as it was substantially related to the alleviation of "existing low field prices [which] were 'resulting in economic waste and conducive to physical waste,'" the Court rejected Cities Services' Due Process and Equal Protection attacks on the Commission orders as being "virtually without substance." 340 U.S. 179, 185–86, 71 S.Ct. 215, 95 L.Ed. 190.

The factual background which preceded enactment of the Allocation Act evidences the increasingly demanding and complex problems facing the country and its governing bodies. The United States unquestionably has become perilously dependent on foreign produced oil, the supply of which is very unstable. By 1973, before the Arab oil embargo, the percentage of crude oil imported for consumption in the United States had reached 35 per cent.[18] The Emergency Petroleum Allocation Act of 1973, as amended, was enacted to meet this and other related energy problems.

While the nation's supply of domestic and imported crude oil is presently adequate, there is a severe shortage of domestically produced crude oil. The availability of imported crude oil is uncertain, and it can be purchased only at drastically higher prices. Greater access to lower cost domestic crude oil by the larger refiners as a class, leaving the small and

ways calls for fresh reminder that courts must not substitute their notions of expediency and fairness for those which have guided the agencies to whom the formulation and execution of policy have been entrusted. . . . It is not for the federal courts to supplant the Commission's judgment even in the face of convincing proof that a different result would have been better.

**17.** Hardwicke, Legal History of Proration of Oil Production in Texas, 56 Tex.Bar Ass'n Proceedings 99, 111, 120 (Tex.L.R.1937). By 1932, oil and gas were "universally recognized by courts and Legislatures as natural resources; and legislation looking to their conservation and the prevention of . . . [their waste had] been enacted in practically every state where these resources . . . [were] discovered." Danciger Oil & Refining Co. v. Railroad Commission, 49 S.W.2d 837, 840 (Tex.

Civ.App.—Austin 1932). It was legislation dealing with these interests of conservation which spawned contumacious production and voluminous litigation for many years. For a background of the Texas experience and the litigation of the oil and gas legislation enacted there, referred to by the Supreme Court in Railroad Com. v. Rowan & Nichols Oil Co., 310 U.S. 573, 580, 60 S.Ct. 1021, 84 L.Ed. 1368 (1939), as an example of the litigation following administrative efforts to solve the adjustment of state and private interests in natural resources, see the Special Order in question and quoted in Consolidated Gas Utilities Corp. v. Thompson, 14 F.Supp. 318, n. 3, 319–321 (W.D.Tex.1936).

**18.** Project Independence, Executive Summary, 3 CCH Energy Management ¶ 25,005, at p. 25,-012 (Fall 1974).

independent refiners as a class to fend for themselves in purchasing the higher priced imported or domestically produced "new" oil, brought about the necessity for the Entitlements program.

 We repeat that the Entitlements program, like others under the Allocation Act, is a temporary program. *Condor Operating Co. v. Sawhill,* 514 F.2d 351 (Em.App.1975), cert. denied, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975).[19] It composes one segment of an over-all emergency program designed to alleviate the inflationary-recessionary effects on the United States of the Arab oil embargo and the four-fold increase in world oil prices, while the nation prepares itself for energy self-sufficiency and recovery of its economic stability and freedom. The smaller refiners and independent marketers were hit much harder by these world events than were the larger and often integrated oil companies. The fact that Cities Service cannot now capitalize upon these events and refine its own much lower priced oil at will and thereby gain a larger market share or even higher profit margins does not render the program unconstitutional. As stated in *Condor Operating Co. v. Sawhill, supra,* at 361:

> The regulation of future action based on rights previously acquired by the person regulated is not per se prohibited by the constitution. *Fleming v. Rhodes,* 331 U.S. 100, 67 S.Ct. 1140, 91 L.Ed. 1368 (1947). Reasonable and practical regulations which are gener-

ally fair and equitable, although not necessarily so as applied to a particular person, are not unconstitutional when general regulations are necessary to accomplish an appropriate congressional purpose. *Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944), *supra. Wilson v. Brown,* 137 F.2d 348 (Em.App.1943).

In determining the validity of the stabilization authority granted the President under the Economic Stabilization Act, the three-judge court in *Amalgamated Meat Cutters & Butcher Work. v. Connally,* 337 F.Supp. 737, 754 (D.D.C. 1971), noted the relevance of the time frame imposed upon that Act. See *Fry v. United States,* 421 U.S. 542, 95 S.Ct. 1792, 1796, 44 L.Ed.2d 363 (1975). This court has recognized time restraints on the Allocation Act. In *Condor Operating Co. v. Sawhill, supra,* at p. 362, this court said:

> Essential powers of government to meet this or other crises in perilous times would be frustrated by the adoption of an excessively rigid and unprecedented construction inhospitable to broad realities. "A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change." *Block v. Hirsh,* 256 U.S. 135, 157, 41 S.Ct. 458, 460, 65 L.Ed. 865 (1921) . . . . Whether the challenged regulation and enforcement order would pass muster as a long continuing response to chronic energy problems need not be decided.[20]

**19.** The Allocation Act was originally scheduled to expire on February 28, 1975, but on December 5, 1974, it was extended to August 31, 1975. Pub.L. 93–511, 88 Stat. 1608, 1 U.S. Code Cong. & Ad.News, 93rd Cong., 2nd Sess. p. 1852 (1974). The Allocation Act was extended by Congress again on September 29, 1975 until the 15th of November, Pub.L. 94–99, 89 Stat. 481, 94th Cong., 1st Sess., 121 Cong. Rec.H. 9193 (Sept. 26, 1975). On November 14, 1975, President Ford signed Public Law 94–133, which extends the Allocation Act until December 15, 1975. 94th Cong., 1st Sess., 121 Cong.Rec.S. 20046 (Nov. 14, 1975).

**20.** A comparable price equalization pooling program, instituted by the Secretary of Agri-

culture under the Agricultural Marketing Agreement Act of 1937, was upheld by the Supreme Court against contentions that it was contrary to the Fifth and Fourteenth Amendments to the Constitution and an improper delegation of legislative power, in *United States v. Rock Royal Co-Operative,* 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939). The program was implemented to insure an adequate supply of milk while providing a fair division of this most profitable market among producers. All milk producers received a uniform price under the regulation for milk sold to milk handlers even though the value of the milk to the milk handler varied considerably, depending on the particular use made of the milk. However,

■] Further, it is well established that a regulatory scheme will not constitute a tax within the meaning of Article I, Section 8, Clause 1 of the Constitution, unless the real purpose and effect of the statute and regulations promulgated thereunder is to raise revenues for the general support of the government. *Head Money Cases* (*Edye v. Robertson*), 112 U.S. 580, 595, 5 S.Ct. 247, 28 L.Ed. 798, 803 (1884); *Moon v. Freeman*, 379 F.2d 382, 391 (9th Cir. 1967); *United States v. Stangland*, 242 F.2d 843, 848 (7th Cir. 1957); *Rodgers v. United States*, 138 F.2d 992, 995 (6th Cir. 1943). As the court stated in *Rodgers v. United States, supra,* at p. 994:

> The test to be applied is to view the objects and purposes of the statute as a whole and if from such examination it is concluded that revenue is the primary purpose and regulation merely incidental, the imposition is a tax and is controlled by the taxing provisions of the Constitution. Conversely, if regulation is the primary purpose of the statute, the mere fact that incidentally revenue is also obtained does not make the imposition a tax, but a sanction imposed for the purpose of making effective the congressional enactment.

Clearly, the Entitlements program does not, even incidentally, raise any revenue for the government or for its support. The entitlements regulation furthers the objectives and purposes of the Allocation Act by regulating refiners' access to crude oil, the price of which has been set below its market value in furtherance of other objectives of the Allocation Act. In addition, the Allocation Act and FEA regulations permit Cities Service to pass through its increased costs under the program and provide measures for the alleviation of extreme hardship through the exemption process, and the regulatory exceptions from its operation.

■ We hold that the Entitlements Program, promulgated under the authority of the Allocation Act, is valid and constitutional; that the contentions of Cities Service are rejected; that the judgment of the District Court was correct; and it is affirmed. So ordered.

those handlers putting their milk to a more profitable use were required, under a formula described by appellants herein as being "nearly as complex as the CEP [Entitlements Program]," to pay money through a pooling arrangement to those handlers using their milk in a less profitable fashion. While the regulation as originally applied and upheld by the Supreme Court did not regulate producer-handlers in their capacities as handlers, i. e., it did not impose any payment obligation on a handler which was handling or processing its "own-produced" milk, such was subsequently required under an amendment to the regulation issued in 1957. The regulation as amended was upheld in *Ideal Farms, Inc. v. Benson*, 288 F.2d 608 (3 Cir. 1961), *cert.* denied, 372 U.S. 965, 83 S.Ct. 1087, 10 L.Ed.2d 128 (1963); *Freeman v. Vance*, 319 F.2d 841 (5 Cir. 1963).